UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>                    Plaintiff,<br><br>v.<br><br>ROSS BALDWIN, ROBERT JEFFREY JOHNSON, KATHLEEN HOOK, PRECIOUS COMMODITIES, INC., NATIONAL COIN BROKER, INC. and NCB WHOLESALE CO.<br><br>                    Defendants. | Case No. 1:21-cv-5707<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR INJUNCTIVE AND
OTHER EQUITABLE RELIEF, RESTITUTION, AND CIVIL
MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT**

Plaintiff, Commodity Futures Trading Commission ("CFTC" or "Commission"), by and through its attorneys, alleges as follows:

## I.    SUMMARY

1.    From approximately June 2014 through at least October 2019 (the "Relevant Period"), Defendants Precious Commodities, Inc. ("PCI"), National Coin Broker, Inc. ("NCB"), and NCB Wholesale Co. ("NCBW") engaged in a fraudulent and deceptive scheme to solicit and misappropriate at least $8 million in cash and silver (valued at the time of the investments) from at least 60 members of the public in connection with a fraudulent silver leasing program, referred to herein as the "Silver Lease Program" or "Program."

2.    Further, Defendants Ross Baldwin ("Baldwin"), Robert Jeffrey Johnson ("Johnson"), and Kathleen Hook ("Hook") either directly engaged in deceptive conduct in furtherance of the scheme, or did so indirectly by virtue of their being control persons of NCB,

1

PCI, and NCBWC, respectively, and failing to act in good faith or knowingly inducing the fraudulent acts.

3.      Furthermore, PCI, NCB, and NCBWC did not conduct business separately and at arm's length, but rather operated the Silver Lease Program as a common enterprise, and Johnson and Hook were each control persons of that common enterprise.

4.      The Silver Lease Program purported to offer guaranteed monthly lease payments in exchange for the use of silver purchased or owned by the Silver Lease Program investors ("Investors").

5.      Investors in the Program were told that they could either buy silver coins from NCB/Baldwin or pledge to the Program silver that they already owned.

6.      Either way, Investors were told that they would earn a monthly dividend for the use of their silver, i.e., that NCB/Baldwin would use their silver on a short-term basis to fulfill purchase orders and replace the Investors' silver within a few days.  Investors were told that in exchange, they would receive a monthly dividend between 3.9% and 5%.

7.      NCB, PCI, and Baldwin represented to Investors that their investments were guaranteed and fully insured and their silver would be stored by PCI securely in a specified storage facility referred to as a vault (referred to herein as "Storage Facility").

8.      In reality, the Silver Lease Program was a complete fiction because PCI never operated or maintained a vault or secure storage facility capable of storing the silver purportedly held for Investors.

9.      Moreover, any funds invested by Investors to purchase silver coins, as well as any metals pledged to the Program by Investors, were simply misappropriated, including by

payments to or for the benefit of entities associated with Johnson or his family, Baldwin or entities associated with him, and entities associated with Hook or her family.

10.      During the Relevant Period, PCI made numerous false and misleading statements on its website, including false statements about PCI's business activities (i.e., that it bought and sold metal), false statements about PCI's supposed storage of Investors' metal, and false or misleading statements that all metal was fully insured.  In addition, PCI used Investor funds to make monthly payments to Investors that purported to be dividend payments, but which were in fact Ponzi-style payments, misappropriated metal pledged to the Program by Program Investors, and engaged in a scheme to obtain insurance policies under false pretenses so that Program Investors could be provided with supposed proof of insurance.

11.      NCB, by and through Baldwin, made numerous false and misleading statements to Investors in the promotion of the Program, including representing that the investment was fully insured and guaranteed (despite having provided two insurance brokers false information in order to obtain the insurance policies); using a false testimonial in Program promotional material; representing that the Program was Baldwin's Program and failing to disclose Johnson's involvement or Johnson's prior criminal conviction for among other things, bank fraud; representing that he, Baldwin, would not charge a commission until silver reached $25 per ounce and failing to disclose that Baldwin was in fact receiving thousands of dollars in compensation for enrolling Investors in the Program; and falsely telling investors that NCB was a bullion bank and that banks had used the Silver Lease Program.

12.      In addition, Baldwin, both directly and indirectly, provided false information to two insurance brokers in order to obtain insurance policies for PCI (including false statements concerning the ownership and management of PCI) and failing to disclose the involvement of

Johnson or Johnson's criminal background.  The insurance policies were ultimately used in the

marketing of the Silver Lease Program, giving Investors the false impression that their silver was

fully insured and the investment therefore safe.

13.     NCBWC received investor funds from NCB and misappropriated those funds,

including using those funds to make payments to or for the benefit of entities associated with

Johnson or his family, Baldwin or entities associated with him, and Hook or entities associated

with her or her family.  Johnson, in furtherance of the fraud, engaged in a deceptive scheme to

obtain, and retain, an insurance policy for PCI that could be used to promote the Program as fully

insured; to associate PCI with an IRA custodian so that the Program could be offered to Investors

who would be investing retirement funds through individual retirement accounts; and to

represent to IRA custodians that PCI stored metals securely at the Storage Facility.  In addition,

Johnson directed the construction of the PCI website which was used to disseminate false and

misleading statements made by PCI.

14.     The acts, omissions, and failures of PCI's employees and agents alleged herein,

including Johnson, Baldwin, and Hook, have occurred within the scope of their employment,

agency, or office with PCI.  Therefore, PCI is liable, pursuant to Section 2(a)(l)(B) of the

Commodity Exchange Act ("Act"), 7 U.S.C. § 2(a)(l)(B) (2018), and Commission Regulation

("Regulation") 1.2, 17 C.F.R. § 1.2 (2020), as principal for the violative actions and omissions of

PCI's employees and agents, including Johnson and Baldwin.

15.     The acts, omissions, and failures of NCB's employees and agents alleged herein,

including Baldwin, have occurred within the scope of their employment, agency, or office with

NCB.  Therefore, NCB is liable, pursuant to 7 U.S.C. § 2(a)(l)(B) and 17 C.F.R. § 1.2, as

principal for the violative actions and omissions of NCB's employees and agents, including

Baldwin.

16.     The acts, omissions, and failures of NCBWC's employees and agents alleged

herein, including Hook, have occurred within the scope of their employment, agency, or office

with NCBWC.  Therefore, NCBWC is liable, pursuant to 7 U.S.C. § 2(a)(l)(B) and 17 C.F.R.

§ 1.2, as principal for the violative actions and omissions of NCB's employees and agents,

including Hook.

17.     Johnson has controlled PCI, directly or indirectly, and has not acted in good faith

or has knowingly induced PCI's violations of Section 6(c)(1) of the Act,7 U.S.C. § 9(1) (2018),

and Regulation 180.1(a)(1)-(3), 17 C.F.R § 180.1(a)(1)-(3)(2020).  Johnson is therefore liable for

PCI's violations of 7 U.S.C. § 9(1) and 17 C.F.R § 180.1(a)(1)-(3), pursuant to Section 13(b) of

the Act, 7 U.S.C. § 13c(b) (2018).

18.     Hook has controlled NCBWC, directly or indirectly, and has not acted in good

faith or has knowingly induced NCBWC's violations of 7 U.S.C. § 9(1) and 17 C.F.R

§ 180.1(a)(1)-(3).  Hook is therefore liable for NCBWC's violations of 7 U.S.C. § 9(1) and

17 C.F.R § 180.1(a)(1)-(3), pursuant to 7 U.S.C. § 13c(b) (2018).

19.     Baldwin has controlled NCB, directly or indirectly, and has not acted in good

faith or has knowingly induced NCB's violations of 7 U.S.C. § 9(1) and 17 C.F.R § 180.1(a)(1)-

(3).  Baldwin is therefore liable for NCB's violations of 7 U.S.C. § 9(1) and 17 C.F.R

§ 180.1(a)(1)-(3), pursuant to 7 U.S.C. § 13c(b) (2018).

20.     By virtue of this conduct and the conduct further described herein, Baldwin,

Johnson, Hook, NCB, PCI, and NCBWC, either directly or as controlling persons, have engaged,

are engaging, or are about to engage in acts and practices in violation of 7 U.S.C. §§ 9(1) and

Regulation 17 C.F.R. § 180.1(a)(1)-(3).

21.     The Commission brings this action pursuant to Section 6c of the Act, 7 U.S.C.

§ 13a-1 (2018), to enjoin Defendants' unlawful acts and practices and to compel their

compliance with the Act and the Regulations promulgated thereunder.  In addition, the

Commission seeks civil monetary penalties, and remedial ancillary relief, including, but not

limited to, trading and registration bans, restitution, disgorgement, rescission, pre- and post-

judgment interest, and such other and further relief as the Court may deem necessary or

appropriate.

22.     Unless restrained and enjoined by this Court, Defendants will likely continue to

engage in acts and practices alleged in this Complaint and similar acts and practices, as described

below.

## II.    JURISDICTION AND VENUE

23.     Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2018), authorizes the Commission

to seek injunctive and other relief in United States district court against any person whenever it

shall appear to the Commission that such person has engaged, is engaging, or is about to engage

in any act or practice constituting a violation of any provision of the Act, or any rule, regulation,

or order thereunder, and provides that district courts "shall have jurisdiction to entertain such

actions." This Court also has jurisdiction pursuant to 28 U.S.C. § 1331 (2018) (federal question)

and 28 U.S.C. § 1345 (2018) (United States as plaintiff).

24.     Venue lies properly with this Court pursuant to Section 6c(e) of the Act because

Defendants transacted business in this District, and certain transactions, acts, practices, and

courses of business alleged in this Complaint occurred, are occurring, or are about to occur in this District.

### III.    THE PARTIES

25.    Plaintiff **Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act, 7 U.S.C. §§ 1-26 (2018), and the Regulations promulgated thereunder, 17 C.F.R. pt. 1–190 (2020).

26.    **Defendant Robert Jeffrey Johnson ("Johnson")** was a control person for PCI and has been integrally involved in all aspects of the Silver Lease Program.  In 2012, Johnson pleaded guilty in the U.S. District Court for the Southern District of Ohio to bank fraud, destruction, alteration, or falsification of records in federal investigations, and willful failure to collect or pay over taxes.  Plea Agreement, *United States. v. Johnson*, No. 2:10-CR-223-GLF-1 (S.D. Ohio, Sept. 27, 2012), ECF No. 83.  Johnson was sentenced to 15 months in federal prison followed by three years supervised release.  Minute Order, *United States v. Johnson*, ECF No.97. Johnson is married to Hook's daughter and has never been registered with the Commission in any capacity.

27.    **Defendant Ross Baldwin ("Baldwin")** is the owner, operator and principal of NCB, has promoted the Silver Lease Program, has held himself out as an owner/manager of PCI, has communicated extensively with insurance brokers to obtain and maintain insurance coverage for metals ostensibly held by PCI, and was identified as a "key executive" on NCBWC bank account opening documents.  Baldwin has never been registered with the Commission in any capacity.

28.    **Defendant Kathleen Hook ("Hook")**, was the incorporator of NCBWC and has served as NCBWC's President, registered representative and sole officer from June 2014 to the

present.  In addition, Hook was registrant for PCI's website, pcidepository.com, used the email address kathy@pcidepository.com, and prepared PCI's taxes over the course of years.  During the Relevant Period, she has been authorized signer on NCBWC's bank account, and NCBWC bank account opening documents identified her as NCBWC's owner and controlling person. Hook has never been registered with the Commission in any capacity.  Hook is the mother of Johnson's wife.

29.    **Defendant Precious Commodities, Inc. ("PCI")** was a Florida corporation, incorporated on or about June 20, 2014, with a last known address in Ft. Lauderdale, Florida.  It was dissolved administratively by the Florida Secretary of State on September 25, 2020 for failing to file its 2020 annual report.  PCI has never been registered with the Commission in any capacity.

30.    **Defendant National Coin Broker, Inc. ("NCB")** is a Florida corporation, incorporated on or about April 23, 2009 by Baldwin, with a last known address in Hallandale Beach, Florida.  During the Relevant Period, Baldwin was the owner, sole officer and registered representative for the company.  NCB promoted the Silver Lease Program, received Investor funds, and transmitted Investor funds to NCBWC.  NCB has never been registered with the Commission in any capacity.

31.    **Defendant NCB Wholesale Co. ("NCBWC")** is a Florida corporation, incorporated on or about June 17, 2014 by Hook, with a last known address in Miami Beach, Florida.  During the Relevant Period, Hook has served as the company President, registered agent and sole officer.  During the Relevant Period, NCBWC made numerous payments of Investor funds to PCI, to or for the benefit of Hook or entities associated with her or her family, to or for the benefit of entities associated with Johnson or his family, and to or for the benefit of

Baldwin or entities associated with him. NCBW has never been registered with the Commission in any capacity.

## IV.   FACTS

### The Silver Lease Program

32.     NCB, including by and through its website, promoted and solicited individuals to participate in what it referred to as the Silver Lease Program.  NCB promotional materials described itself as a "nationally recognized, privately owned buyer and seller of precious metals buillion [sic] and coins" and described the Silver Lease Program: "[y]ou pledge your silver assets to be available for the leasing program[,]" "[w]e lease your silver for a few days to fulfill our orders[,]" "[o]nce we receive our silver, we put it back in your account[,]" and "[y]ou are paid a cash dividend every month your silver is leased under the program."

33.     NCB solicited prospective Silver Lease Program Investors to purchase silver coins (typically American Silver Eagle one-ounce silver coins ("ASEs")) from NCB, send their own ASEs to be pledged to the Program, or to send their own non-ASE silver, coins and/or other precious metals to NCB that NCB in turn claimed to sell and use the proceeds to purchase ASEs that would be pledged to the Program.

34.     Investors looking to participate in the Program sent funds or other assets, such as coins and silver, worth thousands to hundreds of thousands of dollars, to NCB as part of their enrollment in the Silver Lease Program, in exchange for promised monthly "lease payments." Collectively these funds and assets, at the time of investment, totaled over $8 million dollars.

35.     In order to participate in the Program, Investors were required to sign a lease agreement "Lease Agreement," which provided that the Investors would "lend to [PCI] quantities of Silver described and detailed [in the Lease Agreement]."  Lease Agreements were

for a term, typically, of three to five years and provided that PCI would pay Investors a monthly dividend (typically 3.9 to 5%).

36.     The Lease Agreement specifically represented that Silver Lease Investors' silver would be held at the Storage Facility, which the Agreement referred to as a "Vault," and promotional materials, including websites promoting the Program, similarly represented that metals pledged to the Program would be stored in a secure location.

37.     Whether Investors invested money to purchase ASEs, pledged their own ASEs, sent their own silver in the form of non-ASEs that would ostensibly be sold by NCB to purchase ASEs, Investors were led to believe that their ASEs would be held by PCI in a secure vault and that PCI would pay Investors a monthly dividend in exchange for the use of their silver.

38.     For those Investors who sent money for the purpose of purchasing ASEs, the Investors sent their funds to NCB.  These Investors were led to believe that NCB was purchasing ASEs on their behalf and that the ASEs would be pledged to the Program, including by the provision of invoices to Investors indicating that NCB had supposedly sold ASEs to them.

39.     Silver Lease Program Investors were also given the option of investing through a self-directed IRA.  PCI utilized a designated IRA custodian ("Designated IRA Custodian") to administer investors' IRA accounts.  The Designated IRA Custodian received funds from investors that investors intended to use to purchase ASEs to be pledged to the Silver Lease Program and in turn sent those funds to NCB.  The Designated IRA Custodian never took actual possession or custody of silver for or on behalf of Silver Lease Program Investors.

40.     As alleged more fully below, Silver Lease Program Investors were promised that their investments were 100% guaranteed and fully insured.  Investors were provided purported evidence or confirmation of insurance, specifying a supposed "vault number" associated with

10

their individual silver holding.  As alleged more fully below, Baldwin (at times at Johnson's direction and with Johnson's knowledge) provided false information to two insurance brokers to secure PCI's insurance policy, thereby engaging in a deceptive scheme that operated as a fraud on Investors.

41.    Although PCI held itself out to the public as being a secure depository and that it would hold Investor silver, PCI, in reality, was little more than a name, website and bank account.  PCI's physical location was a virtual office that received mail and phone calls.  It never maintained any vault or facility in which it could, or did, store metal on behalf of Silver Lease Program Investors.

42.    Instead of using Investor funds to purchase silver for the investors' benefit, when a Silver Lease Program Investor transmitted funds to NCB for the purpose of purchasing ASEs to pledge to the Program, NCB typically transmitted a portion of those funds to NCBWC, which in turn misappropriated the funds.  Similarly, for those Investors who pledged their own metal to the Silver Lease Program, PCI did not actually hold metal for or on behalf of Program investors at the Storage Facility (or in any other vault or secure location); rather, the Investors' metal was misappropriated.

43.    During the Relevant Period, NCBWC regularly transferred funds to PCI, which it used to make purported monthly "dividend" payment to Investors.  In reality, because PCI did not actually hold any silver in the Storage Facility (or in any other vault or secure location) that had been pledged to it pursuant to the Silver Lease Program, because PCI did not actually conduct any legitimate business, and because the funds of later investors were used to make the purported "dividend" payments, the payments were fraudulent Ponzi-style payments.

11

44.     Under the terms of the Silver Lease Agreements, Investors were entitled to the return of "like weights and grades" of the leased silver at the conclusion of their leases.

45.     In all, more than 60 Investors invested funds or silver with the Program worth a combined total of more than $8 million dollars at the time of investment.  Although PCI did make purported monthly "dividend" payments to investors, those payments largely ceased in the Spring of 2019, and Investors have not received back their silver that was supposedly pledged to the Silver Lease Program, whether in like weight or grade or its dollar value equivalent.

**Companies Comprising the Silver Lease Program Common Enterprise**

46.     As alleged above, the funds of Silver Lease Program Investors were funneled through three interrelated entities, NCB, NCBWC, and PCI.

47.     NCB solicited Investors to participate in the Silver Lease Program, received funds from Investors, and purported to sell ASEs to Investors to be pledged to the Silver Lease Program.

48.     NCB was a Florida corporation, incorporated on or about April 23, 2009 by Baldwin.

49.     During the Relevant Period, Baldwin was the owner, sole officer and registered representative for NCB and signer on NCB's bank accounts.

50.     During the Relevant Period, NCB funneled Investor funds to NCBWC, which misappropriated those funds.

51.     NCBWC was a Florida corporation, incorporated on or about June 17, 2014 by Hook.

52.     At all times during the Relevant Period, Hook was NCBWC's president, registered agent, sole officer, and signer on NCBWC's bank accounts.  Account opening documents for NCBWC's bank accounts indicate that Hook was NCBWC's sole owner.  At various times during the Relevant Period, Baldwin was also an authorized signer on at least one of NCBW's bank accounts and was identified in NCBWC's bank account opening documents as a key executive with control over the entity.

53.     PCI held itself out to Silver Lease Program Investors as the lessor of, and depository for, silver pledged to the Program.

54.     PCI was a Florida corporation, incorporated on June 20, 2014. It was dissolved administratively by the Florida Secretary of State on September 25, 2020 for failing to file its annual report.

55.     In 2012, Johnson pleaded guilty in the U.S. District Court for the Southern District of Ohio to bank fraud, destruction, alteration, or falsification of records in federal investigations, and willful failure to collect or pay over taxes and was sentenced to 15 months in federal prison to be followed by three years of supervised release.  According to publicly available records from the U.S. Bureau of Prisons, Johnson completed his federal sentence in September 2014.

56.     Months before Johnson completed his federal sentence, in June 2014, Johnson's email address was used to communicate with a Florida-based virtual office provider, which provided mail service, phone services and as-needed work space locations in exchange for a monthly fee.  PCI entered into a service agreement with the virtual office provider, and Johnson was listed as the signer of that agreement on behalf of PCI.  PCI provided NCBWC's address (which was also a virtual office location) to PCI's virtual office provider as PCI's billing address.

57.    PCI registered two websites, preciouscommoditiesinc.com and
pcidepository.com.  Preciouscommoditiesinc.com was registered on or around June 21, 2014.
PCIdepository.com was registered on or around June 23, 2014.  "Kathy Hook" was identified as
the registrant contact for both websites.  The preciouscommoditesinc.com domain registration
listed Kathy Hook as being associated with "Precious Commodities Inc."

58.    On information and belief, Hook used the email address
kathy@pcidepository.com in connection with, among other things, obtaining an insurance policy
for PCI.

59.    A credit card in the name of Hook, was used to pay for PCI's website, and at
various times Johnson and Hook provided Individual-1 with the credit card information to pay
for the website, which credit card they referred to as NCBW's corporate credit card.

**PCI's Website and Scheme to Obtain Insurance in**
**Effort to Make the Silver Lease Program Appear Legitimate and Safe**

60.    On or about July 21, 2014, Johnson sent an email to Individual-1 (who worked
with Baldwin and generally assisted with the Silver Lease Program), telling her what email
addresses and telephone number to publish on PCI's website and approving certain content to be
included on PCI's website, including the false and misleading statement that PCI held metal off
PCI's balance sheet.

61.    The website purported to explain how PCI operated, falsely claiming "Precious
Commodities Inc. specializes in precious metals" and that the company "buy[s] and sell[s]
precious metals."  The website made additional false representations that metals in the lease
program were used to "quickly fulfill new purchases" and that PCI "return[ed] your metals once
[PCI's] stock is replenished."  The website made additional claims regarding its operations,
claiming that "all metals are fully allocated and held off the balance sheet."  The website also

sought to entice potential Investors with an offer of a "3.9% ROI" and claims that it paid "a premium for every ounce pledged to the lease program equal to 3.9% of the value of your metals."

62.    PCI's website made additional false and misleading claims, stating that "*[o]ur vault* uses cutting edge security technology" and touting its "high tech vault storage" (emphasis added).  PCI's website further stated that "with no human access to the storage areas and unparalleled security features, we provide the best defense against theft, vandalism and natural disasters."

63.    PCI's website also made misleading claims that "all metals are fully insured" and that "insurance covers the entire value of your metals."

64.    All of these statements on PCI's website were misleading and false because PCI never functioned as a depository, never maintained any storage facility (much less "high tech vault storage"), and never leased metal from Program Investors to "quickly fulfill new purchases."

65.    Indeed, PCI did not conduct business as a metals dealer (i.e., did not routinely buy and sell metal) or conduct any other legitimate business, , but rather served simply as an intermediary to make purported monthly "dividend" payments to Investors, which were in fact nothing more than Ponzi-style payments.

66.    In order to give apparent credence to PCI and NCB's claims that Program investments were "fully insured" or "100% insured," PCI obtained an insurance policy through an insurance broker located in New York County ("NY Insurance Broker-1"), which purported to cover silver stored by PCI at the Storage Facility.

67.     In PCI's initial application for insurance with NY Insurance Broker-1, which was attached to an email Individual-1 sent to Insurance Broker-1, copying, among others, Johnson and Baldwin, PCI represented that Baldwin was an owner or principal of PCI.  In the text of the email to which the application was attached, Individual-1 stated that: PCI "is going to serve as a storage depository for precious metals for IRA clients . . . Once we take possession of the metals, they will be held [at Storage Facility]. There will be no public access to the storage facility. Only Ross Baldwin will interact with the metals should they need to be shipped out on the rare occasion . . . I have also attached a pdf file describing the high security storage features provided by [the Storage Facility]."

68.     In connection with PCI's application, PCI sought coverage of more than $2 million to insure silver purportedly stored in the Storage Facility.  Over time, PCI increased the coverage under its insurance policy multiple times, often at Johnson's explicit direction to do so. By 2017, the coverage on PCI's insurance policy had been raised to more than $7 million.

69.     Under the policies obtained and renewed through NY Insurance Broker-1 and at PCI's request (often made to NY Insurance Broker-1 by Individual-1 and Baldwin), Insurance Broker-1 issued certain documentation typically referred to as "Evidence of Insurance" that were tailored to each Program Investor, referred to the Investor as a "Loss Payee," stated "[t]his is to evidence that: [PCI] . . . [h]as currently in force insurance for all risks of physical loss or damage . . . Precious Metals . . . .," and noted the Investor's name, address, the dollar value of their silver and an individualized "Vault number."

70.     Baldwin testified under penalty of perjury that he provided NY Insurance Broker-1 the Investor's account number (which Johnson provided to Baldwin), name, address, and amount of silver so the individualized insurance documents could be issued.  Baldwin testified

16

that it was important to him to get the individualized insurance documents "right away . . . so [Investors] feel comfortable."

71.    Between July 2014 and October 10, 2018, NY Insurance Broker-1, based on information provided by individuals, including Baldwin and Individual-1, and at times acting on the instructions of Baldwin or Johnson, issued "Evidence of Insurance" documents to more than 40 Silver Lease Program investors, indicating that, in total, more than $6 million worth of silver was insured, and that each Investor's silver was associated with a unique "vault number."

72.    Baldwin also regularly communicated with NY Insurance Broker-1 concerning PCI's insurance policy, including about the coverage of PCI's policy and issues regarding the payment of premiums.

73.    In or around May 2015, Insurance Broker-1 contacted PCI, requesting that PCI submit an insurance renewal form and stating that "[i]t is important that you answer all questions as fully as possible.  Should you feel that your risk has changed in any way please let me know at this time.  Changes to the risk may include alterations to your security arrangements, a variation of the stock you keep or different locations being used."  On or around May 26, 2015, Johnson forwarded the request to Baldwin, stating "You did such a great job last time maybe you will do it again?"

74.    On or around June 30, 2016, Johnson emailed Baldwin:  "Please reply to [Insurance Broker-1] as requested confirming the renewing quote be based on the expiring quote. Nothing has changed."

75.    On or around July 24, 2018—after the Commission issued investigative subpoenas—Baldwin sought to distance himself from PCI's insurance policy, claiming to NY Insurance Broker-1 that PCI "is not my company I only recommend you."  NY Insurance

Broker-1 replied to Baldwin: "[a]s you have been our only contact could you advise who the contact is?"

76.    After the policy with NY-Insurance Broker-1 was not renewed, on or around October 5, 2018, Baldwin communicated with a second insurance broker, also located in New York County ("NY Insurance Broker-2"), concerning PCI's business exposures and the need for an insurance quote.  According to NY Insurance Broker-2's record of the telephone call with Baldwin, Baldwin indicated that PCI needed only "[s]tatic risk coverage."  Static coverage means coverage limited to a fixed location and would not cover items in transport to or from the fixed location.

77.    Based on Baldwin's representations to NY-Insurance Broker-2, PCI was issued an insurance policy in or around October 2018, providing PCI $7,000,000 in coverage for precious metals stored in the Storage Facility.

78.    In connection with PCI's application for insurance coverage, Baldwin represented to NY-Insurance Broke-2, falsely, that Baldwin was a manager of PCI.  In addition, Baldwin failed to disclose Johnson's involvement with PCI or Johnson's prior felony convictions (including for financial fraud).

79.    Baldwin's statements to NY Insurance Broker-2 that he was a manager of PCI are inconsistent with his previous statement to NY Insurance Broker-1 that "PCI is not my company" and subsequent statements to NY Insurance Broker-2.

80.    On or around October 10, 2018, Insurance Broker-2 emailed Baldwin stating "[o]ur compliance department have advised . . . while working on KYC [i.e., Know Your Customer] checks we are able to find various potential matches for [Individual-2]" and that "I'm

18

not familiar with Individual-2.  Is this person an owner of the company?"  Baldwin forwarded the email to Johnson.

81.    Individual-2 was Johnson's wife.

82.    Baldwin responded to NY Insurance Broker-2's email on or around October 10, 2018, providing Individual-2's full name and date of birth and indicating that Individual-2 was in "sales."  Baldwin did not, however, disclose Individual-2's relationship to Johnson, Johnson's affiliation with PCI, or Johnson's prior criminal conviction for, among other things, bank fraud.

83.    On or around October 30, 2018, when asked by Commission staff during his sworn investigative testimony whether Individual-2 had any role with PCI, Baldwin stated under penalty of perjury, "[n]ot to my knowledge."

84.    Baldwin engaged in a deceptive scheme when he took steps to acquire insurance on behalf of PCI while falsely claiming to be a manager of PCI; failing to disclose Johnson's association with PCI (notwithstanding that Johnson was Baldwin's point of contact for, and was involved in all aspects of, the Silver Lease Program); failing to disclose Johnson's prior conviction and prison sentence for, among other things, bank fraud (despite being aware of that criminal history); making misleading statements in response to NY Insurance Broker-2's inquiry regarding Individual-2 and her association with PCI that further obfuscated Johnson's association with the PCI; and failing to disclose that he, Baldwin, either knew that PCI did not store any metal on behalf of customers at the Storage Facility or else that he did not know whether that it was true or not.

85.    Baldwin concealed the truth about PCI's operations so that he could continue to provide Silver Lease Program Investors supposed proof that their metals were fully insured.

86.     Under the policy obtained through NY Insurance Broker-2 and at PCI's request (often made by Baldwin), NY Insurance Broker-2 issued certain documentation, typically referred to as a "Confirmation of Insurance," that  were tailored to each Program Investor, indicated that the Investor "is named under the Loss Payable section of the [PCI] Policy," indicated that PCI was the assured, indicated the "amount of insurance" (the purported value of the silver stored for the Investor), noted that insurance covered "material at [Storage Facility]," and provided an individualized "vault number" for each Investor.

87.     On or around October 12, 2018, NY Insurance Broker-2 provided Confirmation of Insurance documents to Baldwin, showing purported insurance covering at least 40 Silver Lease Program Investors for a combined total of approximately $6 million.

88.     Because PCI sought insurance coverage when it in fact it had never stored metal for Program Investors at Storage Facility, PCI's insurance policies did not in fact provide actual protection to PCI or Silver Lease Program investors.  Rather, PCI obtained the insurance in furtherance of the scheme to misrepresent to Investors that their metals would be insured and lull them into believing that their investments would be safe.

**NCB and Baldwin's Fraudulent Promotion of the Program**

89.     Throughout the Relevant Period, Baldwin engaged in a fraudulent scheme to promote the Silver Lease Program.

90.     Baldwin was the registered owner of the silverlease.com website and testified under penalty of perjury that he was responsible for the content of the website.

91.     The silverlease.com website falsely referred to the Program as "my program" and "my silverlease program."  Similarly, NCB's Silver Lease Program website represented that NCB was doing business as SilverLease.com and listed NCB's business address and phone

number as the contact information for the Silver Lease Program. The silverlease.com website also stated "[a]s a bullion bank we receive large orders on a daily basis and in order to lock in these orders we must have physical Silver on hand. If we don't have the physical Silver on hand, we can't lock in the order to fulfill the transaction and we lose the sale. This is where the Silver Lease Program comes into play. Because you pledge your Silver to the Silver Lease Program, we always have physical Silver on hand and we're always able to fulfill our orders. You benefit because we will pay you a 3.9% to a 5% guaranteed cash dividend for the privilege of using your Silver!"

92.    The silverlease.com website further described the Silver Lease Program: "The process for how the Silver Lease Program works is very simple. One, we receive a large order for silver which we lock in. Two, we borrow the silver from you to fulfill the order. Three, we put the silver back in your account once we receive our silver order from the U.S. Mint within a few days." The website similarly stated that, "We simply borrow your Silver to fulfill large orders promptly. We then replace your Silver when we received our replacement order from the US Mint within a few days."

93.    NCB and Baldwin's representations describing the Program as "my" or NCB's Program were false and materially misleading, and they concealed a reality that Baldwin did not disclose, namely that Johnson was Baldwin's contact person for all aspects of the Silver Lease Program, that Johnson was involved in virtually every aspect of the Program, and that Johnson had been convicted and served prison time for, among other things, bank fraud.

94.    Baldwin's statements gave the false impression that he personally operated a legitimate business, which was a "bullion bank" that leased investors' metal, that he used Investors' silver to fulfill large orders, and that he then replaced that metal. In sharp contrast to

that picture, however, Baldwin stated to Commission staff during his investigate testimony, under penalty of perjury, that he was not involved in the borrowing or replacement of Investors' silver and had never actually even seen any of the metal supposedly being stored on behalf of Investors.

95.    The silverlease.com website made numerous false and misleading statements regarding the supposed safety of the Program: "There is no other investment available to you that is guaranteed, insured and gives the return on investment that our Silver Lease Program does"; "We guarantee the program in writing, and we insure your Silver!"; "The full value of your silver is insured";  "Guaranteed and insured!"; "Are you looking for an investment that is guaranteed and insured?  We know what you are thinking . . . An investment that is both insured and guaranteed? That's not possible!"; "You will also be issued an insurance certificate covering the full value of your Silver at the start of the program. You will never have to worry about the loss of your investment"; "Your Silver is independently insured."

96.    All of these statements were false because PCI never stored, or had the capability of storing, metal in a secure depository.  Baldwin either knew that PCI did not store silver at Storage Facility or, at a minimum, acted with reckless disregard as to whether PCI in fact held silver or not.

97.    Baldwin knew that the statements regarding the investment being guaranteed and insured were false or at the very least disregarded whether the statements were true or not. Notwithstanding Baldwin's representations to Investors that their investments were insured and that they did not have to worry, Baldwin knew or else recklessly disregarded the fact that he had made false statements to NY Insurance Broker-1 and NY Insurance Broker-2 in the acquisition of the insurance policies for PCI.

98.     NCB and Baldwin repeated these false claims in print brochures that NCB disseminated at trade shows.

99.     NCB's Silver Lease Program brochure claimed, for example: "Demand for Silver, espeically [sic] American Silver Eagles is so high, it can be difficult at times to source.  In order to source [obtain inventory] for new orders quickly, the silver I sell is borrowed from you.  You pledge your silver assets to be available for the leasing program.  We lease your silver for a few days to fulfill our orders.   Once we receive our silver we put it back in your account."

100.    The brochure's description of the Program was false because, as alleged above, Baldwin was not actually involved in the borrowing or replacement of Investors' silver.

101.    The brochure also contained a false testimonial from "Emily D," purportedly claiming that "[t]he Lease Program allowed me to bring down my cost average while waiting for the price of silver to increase above what it paid for it.  Great Program!"  Baldwin testified under penalty of perjury that "Emily D" was not actually a Program Investor, but rather that Individual-1 "took a picture offline and just made . . . as a marketing thing."

102.    The brochure also claimed that the Silver Lease Program "has been used by banks to earn money from their precious metals for a long time."  This statement was false because, as Baldwin has stated under penalty of perjury, to his knowledge, no banks have ever used the Silver Lease Program.

103.    The brochure also claimed that Investor silver was stored in a "vault" in a "segregated account."

104.    However, as alleged above, PCI never operated or maintained a vault or secure storage facility capable of storing silver for or on behalf of any Program Investors.

105.    Baldwin knew his representations that silver was stored in a "vault" were false or at the very least he made the statements with complete disregard as to whether they were true or not: Baldwin testified under penalty of perjury that he had never seen any silver actually stored on behalf of Program Investors or taken any steps at the time NCB was soliciting participation in the Program to verify whether or not PCI was in fact holding silver for or on behalf of Investors.

106.    NCB also claimed in the brochure that Investors' silver was "100% insured."

107.    Similar claims that investor metals were "fully insured" were also repeated in email communications NCB and its sales representatives made to potential Investors.

108.    At various times during the Relevant Period, NCB, by and through Baldwin, claimed to Investors that he would not charge a commission until silver rose to, typically, approximately $25 per ounce.  Baldwin's statement regarding his compensation misleadingly reinforced the impression that Baldwin functioned solely as a buyer and seller of metal.  By failing further to disclose that he, in fact, received thousands of dollars in compensation for his enrollment of Investors in the Program, he misled Investors as to his actual role and motivation for promoting the Silver Lease Program.

109.    In his promotion of the Silver Lease Program, Baldwin never disclosed to Investors or prospective Investors Johnson's involvement with the Program or the fact that Johnson had been convicted of, and served a federal prison sentence, for among other things, bank fraud.

110.    Baldwin testified under penalty of perjury that he, Baldwin, was aware of Johnson's criminal conviction at the time Baldwin was promoting the Program and that the conviction was "something about taxes" and had "something to do with banks," but Baldwin did not disclose Johnson's criminal conviction to Investors or prospective Investors.

**NCBWC and PCI Misappropriated Investor Funds and Metal**

111.    During the Relevant Period, NCB received millions of dollars in Investor funds, the majority of which were transferred to NCBWC.

112.    NCBWC did not use those funds to purchase silver on behalf of Program Investors, but rather diverted those funds for other uses.

113.    NCBWC used some Investor funds to engage in apparent purchases of silver at various times; however, those transactions did not result in the purchase or storage of silver at Storage Facility on behalf of Investors.

114.    During the Relevant Period, NCBWC misappropriated Investor funds by, among other things, transferring funds to PCI, to or for the benefit of entities associated with Johnson or his family, to or for the benefit of Baldwin or entities associated with him, and to or for the benefit of Hook or entities associated with her or her family.

115.    During the Relevant Period, NCBWC transferred more than $1 million to PCI.

116.    PCI made purported "dividend" payments during the Relevant Period, which were not actually generated by virtue of any legitimate business operations, but rather were payments made from other investor funds, or in other words, Ponzi-style payments.

117.    During the Relevant Period, PCI did not conduct business as a metals dealer (i.e., routinely buy and sell metal) or conduct any other legitimate business activity.

118.    PCI misappropriated metal pledged to the Program by Program Investors.

119.    In later 2018 and early 2019 multiple Silver Lease Program Investors contacted Baldwin to complain about late or missing lease payments.  PCI largely ceased making purported dividend payments to Silver Lease Program Investors in the Spring of 2019.

120.    Silver Lease Program Investors have been unable to obtain their silver, in like weight and grade, or the dollar value thereof.

**PCI, NCBWC, and NCB Operated the Silver Lease Program as a Common Enterprise**

121.    The Silver Lease Program was conducted by interrelated companies, including PCI, NCBWC, and NCB.

122.    PCI, NCB, and NCBWC transferred Investor funds between them.

123.    PCI, NCB, and NCBWC did not conduct business at arm's length or observe corporate formalities, but rather were commonly controlled and shared employees, consultants, or agents, including Johnson, Hook, Baldwin, and Individual-1.

124.    NCB was the exclusive marketer of the Silver Lease Program.

125.    Baldwin held himself out at various times as owner and/or manager of PCI.

126.    As alleged above, Hook was the registrant for PCI's website and used a PCI email address.  PCI made payments for its website on a credit card referred to as NCBWC's corporate credit card.

127.    As alleged above, PCI provided NCBWC's address to PCI's virtual office provider as PCI's address.

**Johnson and Hook Controlled the Common Enterprise**

128.    Throughout the Relevant Period, Johnson and Hook sent and received numerous emails relating to the operation of the Silver Lease Program, including emails relating to the payment of purported monthly dividends, relating to Lease Agreements, relating to PCI's website, relating to the purported storage of silver on behalf of Investors, relating to summaries of Investors (including the amounts invested, amounts of silver purportedly pledged to the

Program, and the amounts of purported monthly dividends), relating to PCI's insurance policies, and relating to IRA accounts.

129.    Johnson controlled the day-to-day operations of PCI and the Program, and Hook was involved in, and controlled key aspects of the recordkeeping and operations of PCI, NCBWC, and the Program.  For example:

a)    In or around 2014, Johnson communicated with potential IRA custodians in effort to secure a relationship between PCI and an IRA custodian, for the purpose of facilitating investments in the Program through self-directed IRAs.

b)    In 2014, Johnson, Hook, and Individual-1 communicated in order to set up PCI's website.

c)    On or around September 4, 2014, Individual-1 emailed Johnson: "What address should I provide to have metals that will be stored with PCI shipped to?"  Johnson replied with his wife's name and address (which was also Johnson's address).

d)    On or around January 28, 2015, Individual-1 emailed Johnson that an Investor "has asked for a statement of the metals you have in storage for her.  Can you make one for me?"

e)    On or around January 29, 2015, Individual-1 emailed Johnson and Baldwin, attaching to the email a list of Program Investors, which list showed, by Investor, among other things, whether they had signed the Lease Agreement.  In the email, Individual-1 wrote: "I've updated showing who has signed now . . . Still waiting on [one Investor] and the

second agreement from [another Investor].  I have emailed them both
twice regarding the agreements."

f)     On or around February 13, 2015, Individual-1 emailed Johnson and
Baldwin: "Hi Jeff, Can you let me know what accounts you paid on for
January?  The check amount . . . doesn't match the payment amount I sent
to you . . . ."  Individual-1 attached to the email a summary of dividend
payments to be made to Program Investors for January 2015.

g)     On or around February 19, 2015, Individual-1 emailed Johnson, "When
you write checks to [Designated IRA Custodian] for silver lease program
payments to IRA accounts, do you write individual checks made out to
'[Designated IRA Custodian] fbo CLIENT NAME'?"  Johnson forwarded
Individual-1's email to Hook the same day.  Johnson replied to Individual-
1 on or around February 24, 2015, attaching a copy of purported lease
payments for February.

h)     On or around April 10, 2015, Hook emailed Johnson and Individual-1
purported reports regarding PCI holdings for IRA accounts.  Individual-1
replied, "Jeff, Will you be sending these out for the accounts that are not
held in an IRA?"  Johnson replied, "No."

i)     On or around May 11, 2015, Hook emailed Johnson, "Never received a
contract for [a Program Investor] with the 500 oz added to his original
contract.  Only contracts I have for him is the 1272 oz and the 1000 oz."
Johnson replied, "I think the contracts were combined into one new one?
All the same rate?"

28

j)      On or around May 12, 2015, Individual-1 emailed Johnson, "I saw the check you texted for [a Program Investor]" and noting that the check amount was not consistent with Individual-1's records.  Johnson forwarded Individual-1's email to Hook, and Hook responded, "I guess if i had the updated contract that is combined would make things easier to keep track of.  I only has [sic] his [i.e., the Investor's] last two contracts and not the combined one."

k)      In or around June 23, 2015, Individual-1 emailed Johnson a requested change to the Lease Agreement by a Program Investor.  Johnson replied, "Ok please make the requested change."

l)      On or around September 3, 2015, after Individual-1 emailed Johnson a report of purported dividend payments to Investors for August 2015, Johnson emailed, "We got [first funds of a particular Investor] middle of August and the second funds at the end.  Let's just start them both on the 21st."  Individual-1 replied on or around September 8, 2015, attaching a revised payment report.

m)      On or around September 21, 2015, when Individual-1 received notice that the credit card had been declined for the hosting of pcidepository.com, Individual-1 forwarded the message to Johnson, stating that "We need to update asap so they don't turn off the hosting and the website goes offline."  Johnson forwarded Individual-1's email to Hook, who provided new credit card information.  When Johnson forwarded the credit card information to Individual-1, Individual-1 stated, "I also need the billing

address."  Johnson forwarded the request to Hook, who provided the billing address.  The billing address that Hook provided was Johnson's home address.

n)    On or around September 21, 2015, Johnson emailed Individual-1, "Let's do a storage agreement for all new IRA clients to meet their new requirements."  Individual-1 replied the same day, attaching a document entitled "Precious Metals Depository Holdings Election Form" and stating in the transmittal email to Johnson, "Read this over and let me know if you approve."

o)    On or around September 21, 2015, Johnson replied to Individual-1: "Looks good to me.  What do you think about changing the words 'election form' to 'Agreement'?"  Individual-1 replied, "I think the term election form is specific to IRA accounts.  I can change it if you wish[.]"  Johnson replied, "I think would be better as more than an election form as PCI is agreeing to terms as well."

p)    On or around December 11, 2015, Johnson emailed Baldwin, "As you know the lease is not valid and does not begin until signed by an authorized PCI representative."

q)    On or around January 25, 2016, Johnson sent an email informing Individual-1 that "all non-IRA accounts will receive 1099-Misc forms this week."  Johnson forwarded to Hook Individual-1's email notifying him that Individual-1 did not have tax identification numbers for investors.  On subsequent dates in January 2016, as well as multiple dates in February

2016, Individual-1 sent Johnson and Hook completed W-9 forms for multiple Silver Lease Investors.

r)    During the Relevant Period, PCI increased the coverage under its insurance policy multiple times, often at Johnson's explicit direction to do so.  For instance, on or around October 8, 2015, Johnson emailed Individual-1: "Please request an $800,000 increase. Thanks."  Notably, Johnson's request for an increase overruled an earlier email response from Baldwin stating no increase in coverage was needed.  Similarly, on or around February 11, 2016, Johnson emailed Individual-1:  " Let's request an increase to $3,700,000 please. Thanks."

s)    In or around December 2016, when a Program Investor requested changes to the Lease Agreement, Baldwin forwarded the requested changes to Johnson.

t)    On or around January 24, 2017, Hook emailed Johnson a list of Program investors, stating "I need W-9 for all these clients to get their 1099's out in time."  Johnson in turn forwarded the email to Baldwin.

u)    On or around July 2017, Individual-1 received an email with a renewal quote for the PCI insurance policy from NY Insurance Broker-1. Individual-1 forwarded that email to Baldwin with the message "This is for Jeff – PCI."  Later that month, Baldwin received  an email from NY Insurance Broker-1 with a revised renewal quote for the PCI insurance policy and forwarded that email with the revised renewal quote to Johnson. Johnson, in turn, forwarded the email with the revised renewal

quote to Hook.  When Baldwin received a confirmation email from NY

Insurance Broker-1 stating that the policy was "bound," Baldwin again

forwarded that email to Johnson.

v)    On or around July 5, 2017, Johnson emailed Hook a summary of all

Program Investors, reflecting purportedly pledged metal totaling more

than $6.1 million, and stating "Take [specified Program Investor] off same

as last month."

w)    On or around July 12, 2017, when a Program Investor emailed Baldwin

regarding a change of address, Baldwin forwarded the message to

Johnson, who in turn forwarded it to Hook.

x)    On or around November 15, 2017, Designated IRA Custodian emailed

Baldwin, stating, among other things, that "There is a concern about the

recordkeeping of the depository and we need to make sure everything is in

order before accepting any new accounts."  Baldwin forwarded the

message to Johnson, who in turn forwarded the message to Hook.

y)    On or around December 22, 2017, Johnson emailed Baldwin regarding a

Program Investor, who had invested through an IRA account, stating: "Do

we need a Sell Directive from [Designated IRA Custodian] or [the

Investor]?  Please have [the Investor] sign revised agreements so we have

correct paperwork.  Checks are ready.  Mail upon receipt of paperwork?"

z)    In or around 2018, when the Designated IRA Custodian questioned

Baldwin about the Silver Lease Program, including a request that he

"provide some way for us to verify with [Storage Facility] that they are

actually in possession of these metals," Baldwin forwarded he the email correspondence to Johnson, and Johnson directed Baldwin how to respond, in some cases ghostwriting Baldwin's responses.

aa)   In or around December 2017 and January 2018, Johnson communicated with a potential new IRA custodian, including sending an executed Commercial Depository Administration & Vault Lease Agreement between PCI and the potential new custodian.

bb)   On or around February 20, 2018 Johnson directed Baldwin to respond to the Designated IRA Custodian, stating that "PCI holds the metals in the names of the client IRAs and account numbers/vault numbers on the leases and on the report at the [Storage Facility]." This statement was false because PCI did not maintain any storage space, secure vault or otherwise, at the Storage Facility.

cc)   Similarly, on or about February 26, 2018, Johnson emailed Baldwin a response for Baldwin to send to the Designated IRA Custodian, stating the insurer "issues insurance certificates for all the separate vaults within the depository" and that "[t]he client chooses the depository based on my recommendation [i.e., ghostwriting in Baldwin's voice], their own research, the storage rates and/or insurance." Baldwin subsequently used Johnson's language in his, Baldwin's, response to the Designated IRA Custodian.

dd)   In October 2018, after NY Insurance Broker-1 notified Baldwin that it would not renew PCI's insurance coverage, Baldwin attempted to find

replacement coverage, contacting at least three insurance brokers. Baldwin forwarded copies of those communications to Johnson. After receiving a quote from one issuance broker, Baldwin forwarded the quote to Johnson with the message "There is one more quote coming."

ee)    In or around October 2018, when Baldwin was attempting to procure an insurance policy for PCI from NY Insurance Broker-2, Baldwin forwarded Johnson an email with questions he received from NY Insurance Broker-2 regarding PCI with the message, "Need to answer the questions in red and send back." The questions pertained to the name of the principal of PCI, the number of years PCI had been trading in the industry and the number of employees.

ff)    In or around October and November 2018, Baldwin  forwarded Johnson emails from NY Insurance Broker-2 regarding PCI's new insurance policy. Johnson forwarded some of those emails to Hook, among others.

gg)    In or around October 2018 Baldwin forwarded to Johnson emails from a Silver Lease Program Investor complaining about missing and late lease payment checks. Johnson forwarded at least one of those emails to Hook.

hh)    On or around February 4, 2019 Baldwin forwarded to Johnson an email from a Silver Lease Program Investor regarding changes to how her lease payment checks should be written. Baldwin wrote to Johnson, "Wants all her checks moving forward to be in her name only . . . take off husband name." Johnson forwarded that email to Hook the same day.

ii)   In or around 2019, Baldwin forwarded to Johnson multiple complaints he received from the Investors regarding missing lease payment checks, that they have been unable to reclaim their silver and/or were unable to file an insurance claim under the PCI insurance policy.  When one customer informed Baldwin he had retained a lawyer, Baldwin forwarded the email to Johnson with the message "You need to read this."

jj)   In September 2019, Baldwin forwarded email from NY Insurance Broker-2 to Johnson, as NY Insurance Broker-2 was attempting to collect payment on the PCI policy.  Johnson in turn forwarded at least some of those emails to Hook.

kk)   Similarly, in or around September 2019, Baldwin forwarded Johnson emails regarding the Insurance Notice of Cancelation and the PCI insurance policy that he, Baldwin, received from NY Insurance Broker-2. Johnson in turn, forwarded at least some of those emails to Hook.

ll)   Johnson received email confirmations of payments made for PCI's virtual office space from at least May 2017 to October 2019.

130.   Hook was the President, registered representative and sole officer of NCBWC.

131.   Hook was signer on NCBWC's bank account.

132.   During the Relevant Period, Hook took an active role in monitoring NCBWC transactions with NCB and sent emails correcting inaccuracies with NCBWC purchase orders. Hook also reviewed Lease Agreements, matched Lease Agreements with incoming deposits and emailed Johnson regarding contract expirations and other issues pertaining to Lease Agreements.

133.    Hook was identified as registrant for PCI's website, pcidepository.com, used the email address kathy@pcidepository.com, and prepared PCI's taxes over the course of years.

134.    In or around July 2018 and February 2019, Hook emailed instructions to PCI's virtual office provider to send PCI's mail to her office in Miami Beach, FL.

## V.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

### COUNT ONE

**Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2018), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2020)**
**(Fraud by Deceptive Device or Contrivance – All Defendants)**

135.    Paragraphs 1 through 134 are realleged and incorporated herein by reference.

136.    The precious metals discussed in this Complaint are commodities as defined by Section 1a(9) of the Act, 7 U.S.C. § 1a(9)(2012.

137.    7 U.S.C. § 9(1), makes it unlawful for any person, directly or indirectly, to:

[U]se or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after [July 21, 2010, the date of enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act].

138.    17 C.F.R. § 180.1(a)(1)-(3) provides, in part:

It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly: (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or] (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

139.    During the Relevant Period, as described above, PCI violated 7 U.S.C. § 9(1) and 17 C.F.R. 180.1(a)(1)-(3) by, among other things, in connection with contracts of sale of commodities in interstate commerce (e.g., silver), making or attempting to make untrue or misleading statements of material fact or omitting to state or attempting to omit material facts necessary in order to make statements made not untrue or misleading, including by:

a.    Making numerous false and misleading statements on its website, including that "Precious Commodities Inc. specializes in precious metals" and that PCI "buy[s] and sell[s] precious metals," that investors' metal was used to "quickly fulfill new purchases," that PCI "return[ed] your metals once [PCI's] stock is replenished," that "all metals are fully allocated and held off the balance sheet," that PCI offered a "3.9% ROI," that PCI paid "a premium for every ounce pledged to the lease program equal to 3.9% of the value of your metals."

b.    Making numerous false and misleading statements regarding how investor metal would be stored, including claiming "*[o]ur vault* uses cutting edge security technology," touting "high tech vault storage" (emphasis added), and claiming that "with no human access to the storage areas and unparalleled security features, we provide the best defense against theft, vandalism and natural disasters."

c.    Making numerous false and misleading statements that "all metals are fully insured" and that "insurance covers the entire value of your metals."

d.    All of these statements were false and misleading because PCI never bought and sold precious metals in connection with the Silver Lease Program and never stored, or had the capability securely to store in any vault or other storage facility metal on behalf Investors.

37

140.    During the Relevant Period, as described above, PCI further violated 7 U.S.C.
§ 9(1) and 17 C.F.R § 180.1(a)(1)-(3) by, among other things, in connection with contracts of
sale of commodities in interstate commerce (e.g., silver), using or employing, or attempting to
use or employ, a device, scheme, or artifice to defraud and engaging, or attempt to engage, in an
act, practice, or course of business, which operates or would operate as a fraud or deceit upon
any person, including:

a.    Receiving investor funds from NCBWC and using those funds to make monthly
payments to investors that purported to be dividend payments, but which were in
fact Ponzi-style payments reflecting other Investors' funds;

b.    Misappropriating metal pledged to the Program by Program Investors; and

c.    Obtaining insurance policies through NY Insurance Broker-1 and NY Insurance
Broker-2 under false pretenses, including that metal pledged to the Program would
be securely stored in the Storage Facility, in order to deceive Investors that their
investments were insured.

141.    During the Relevant Period, as described above, NCB, by and through Baldwin,
violated Section 6(c)(1) of the Act and Regulation 180.1(a) by, among other things, in
connection with contracts of sale of commodities in interstate commerce (e.g., silver), making or
attempting to make untrue or misleading statements of material fact or omitting to state or
attempting to omit material facts necessary in order to make statements made not untrue or
misleading, including:

a.    Making false and misleading statements that investments in the Program were
insured and guaranteed;

b.    Using a false testimonial in a Silver Lease Program promotional brochure;

    c.      Representing that the Program was Baldwin's Program and that he, Baldwin, would use pledged silver to fulfill orders in exchange for a monthly dividend and failing to disclose Johnson's involvement or prior criminal conviction for bank fraud;

    d.      Providing Investors documentation stating that Baldwin would not be paid a commission unless silver prices reached $25 per ounce but failing to disclose the thousands of dollars that Baldwin received in compensation to promoted the Program;

    e.      Representing, falsely, that silver pledged to the Program would be replaced by silver purchased by NCB and/or Baldwin from the U.S. Mint; and

    f.      Representing, falsely, that NCB was a bouillon bank and that banks participated in the Program;

142.    During the Relevant Period, as described above, Baldwin further violated 7 U.S.C. § 9(1) and 17 C.F.R § 180.1(a)(1)-(3) by, among other things, in connection with contracts of sale of commodities in interstate commerce (e.g., silver), using or employing, or attempting to use or employ, a device, scheme, or artifice to defraud and engaging, or attempt to engage, in an act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person, including:

    a.      Providing false information to NY Insurance Broker-1 and NY Insurance Broker-2 in order to obtain insurance coverage for PCI, including but not limited to the ownership and management of PCI and failing to disclose Johnson's role with PCI, in order to obtain purported insurance to deceive Investors that their investments were safe.

143.    During the Relevant Period, as described above, NCBWC violated 7 U.S.C.
§ 9(1) and 17 C.F.R § 180.1(a)(1)-(3) by, among other things, in connection with contracts of
sale of commodities in interstate commerce (e.g., silver), using or employing, or attempting to
use or employ, a device, scheme, or artifice to defraud and engaging, or attempt to engage, in an
act, practice, or course of business, which operates or would operate as a fraud or deceit upon
any person, including by:

    a.    Receiving investor funds from NCB and misappropriating those funds, including
using those funds to make payments to PCI (which PCI used to make Ponzi-style
payments to Investors), to or for the benefit of Hook or entities associated with her
or her family, to or for the benefit of entities associated with Johnson or his family,
and to or for the benefit of Baldwin or entities associated with him.

144.    During the Relevant Period, as described above, Johnson violated 7 U.S.C. § 9(1)
and 17 C.F.R § 180.1(a)(1)-(3) by, among other things, in connection with contracts of sale of
commodities in interstate commerce (e.g., silver), using or employing, or attempting to use or
employ, a device, scheme, or artifice to defraud and engaging, or attempt to engage, in an act,
practice, or course of business, which operates or would operate as a fraud or deceit upon any
person, including by:

    a.    Engaging in a deceptive scheme to set up, and maintain PCI's website, which
contained false information to obtain Investors;

    b.    Engaging in deceptive scheme to obtain, and retain, an insurance policy for PCI
that could be used to promote the Program as fully insured, including by causing
false and misleading statements to be made to two insurance brokers (including
the representation that metal would be securely stored at the Storage Facility and

false or misleading statements about PCI's management) in order to obtain

purported insurance to deceive Investors that their investments were safe; and

c.      Engaging in a deceptive scheme to associate PCI with an IRA custodian, and

maintain association with Designated IRA Custodian, so that the Program could

be offered to investors who would be investing retirement funds through

individual retirement accounts, including by making statements that PCI securely

stored metals at the Storage Facility.

145.    Defendants engaged in the acts and practices described above intentionally and

recklessly.

146.    Each act in furtherance of:  (1) using or employing, or attempting to use or

employ, a manipulative device, scheme, or artifice to defraud; (2) making, or attempting to

make, untrue or misleading statements of material fact, or omitting to state material facts

necessary to make the statements not untrue or misleading; or (3) engaging, or attempting to

engage, in any act, practice, or course of business, which operated or would operate as a fraud or

deceit upon any person, including but not limited to those specifically alleged herein, is alleged

as a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

147.    The foregoing acts, omissions, and failures of PCI's employees and agents,

including Johnson and Baldwin, have occurred within the scope of their employment, agency, or

office with PCI.  Therefore, PCI is liable, pursuant to Section 2(a)(l)(B) of the Act, 7 U.S.C.

§ 2(a)(l)(B) (2018), and Regulation 1.2, 17 C.F.R. § 1.2 (2020), as principal for the violative

actions and omissions of PCI's employees and agents, including Johnson and Baldwin.

148.    The foregoing acts, omissions, and failures of NCB's employees and agents,

including Baldwin, have occurred within the scope of their employment, agency, or office with

NCB.  Therefore, NCB is liable, pursuant to 7 U.S.C. § 2(a)(l)(B) and 17 C.F.R. § 1.2, as principal for the violative actions and omissions of NCB's employees and agents, including Baldwin.

149.    The foregoing acts, omissions, and failures of NCBWC's employees and agents, including Hook, have occurred within the scope of their employment, agency, or office with NCBWC.  Therefore, NCBWC is liable, pursuant to 7 U.S.C. § 2(a)(l)(B) and 17 C.F.R. § 1.2, as principal for the violative actions and omissions of NCB's employees and agents, including Hook.

150.    Johnson has controlled PCI, directly or indirectly, and has not acted in good faith or has knowingly induced PCI's violations of 7 U.S.C. § 9(1) and 17 C.F.R § 180.1(a)(1)-(3). Johnson is therefore liable for PCI's violations of 7 U.S.C. § 9(1) and 17 C.F.R § 180.1(a)(1)-(3), pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2018).

151.    Hook has controlled NCBWC, directly or indirectly, and has not acted in good faith or has knowingly induced NCBWC's violations of 7 U.S.C. § 9(1) and 17 C.F.R § 180.1(a)(1)-(3).  Hook is therefore liable for NCBWC's violations of 7 U.S.C. § 9(1) and 17 C.F.R § 180.1(a)(1)-(3), pursuant to 7 U.S.C. § 13c(b).

152.    Baldwin has controlled NCB, directly or indirectly, and has not acted in good faith or has knowingly induced NCB's violations of 7 U.S.C. § 9(1) and 17 C.F.R § 180.1(a)(1)-(3).  Baldwin is therefore liable for NCB's violations of 7 U.S.C. § 9(1) and 17 C.F.R § 180.1(a)(1)-(3), pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2018).

153.    Because PCI, NCBWC, and NCB operated as a common enterprise, each is liable for the violative acts of each member of the enterprise.

154.    Because Johnson and Hook controlled the common enterprise, they are liable, as control persons, for the violative acts of each member of the enterprise.

## VI.    RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), and pursuant to its own equitable powers:

A.    Enter an order finding that Defendants violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2018), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2020);

B.    Enter an order of permanent injunction restraining, enjoining and prohibiting Defendants and any other person or entity in active concert with them, from engaging in conduct in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3);

C.    Enter an order of permanent injunction prohibiting Defendants and any other person or entity in active concert with them from, directly or indirectly:

1)  Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2018));

2)  Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2020)), for accounts held in the name of any Defendant or for accounts in which any Defendant has a direct or indirect interest;

3)  Having any commodity interests traded on any Defendant's behalf;

4)  Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5)  Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests;

6) Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2020); and

7) Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2020)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the CFTC except as provided for in Regulation 4.14(a)(9);

D.      Enter an order requiring Defendants, as well as any of their successors, to disgorge to any officer appointed by the Court all benefits received from acts or practices that constitute violations of the Act, as amended, and Regulations as described herein, including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, plus pre-judgment interest thereon from the date of such violations, plus post-judgment interest;

E.      Enter an order requiring Defendants, as well as their successors, to make full restitution, pursuant to such procedure as the Court may order, to every person or entity who sustained losses proximately caused by Defendants' violations (in the amount of such losses), as described herein, plus pre-judgment interest thereon from the date of such violations, plus post-judgment interest;

F.      Enter an order directing Defendants and any of their successors, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between them and any of the customers whose funds were

received by them as a result of the acts and practices which constituted violations of the Act, as amended, as described herein;

G.      Enter an order directing each Defendant to pay a civil monetary penalty, to be assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1) (2018), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, 129 Stat. 584 (2015), title VII, Section 701, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2020), for each violation of the Act and Regulations, as described herein;

H.      Enter an order directing that Defendants, and any successors thereof, make an accounting to the Court of all of their assets and liabilities, together with all funds they received from and paid to investors and other persons in connection with commodity interests and all disbursements for any purpose whatsoever of funds received from commodity interests, including salaries, commissions, interest, fees, loans, and other disbursement of money or property of any kind from at least April 2016 to the date of such accounting;

I.      Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2413(a)(2) (2020); and

J.      Enter an order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

Respectfully submitted,

PLAINTIFF COMMODITY FUTURES
TRADING COMMISSION

Manal M. Sultan
Deputy Director
Division of Enforcement

By: /s/ Karin N. Roth

Patrick F. Daly
Senior Trial Attorney
pdaly@cftc.gov

Karin N. Roth
Senior Trial Attorney
kroth@cftc.gov

R. Stephen Painter, Jr. (*pro hac vice* application to be filed)
Chief Trial Attorney
spainter@cftc.gov

Commodity Futures Trading Commission
140 Broadway, 19th Floor
New York, NY 10005
(646) 746-9700