UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COMMODITY FUTURES TRADING
COMMISSION,

Plaintiff,

v.

ROSS BALDWIN, ROBERT JEFFREY
JOHNSON, KATHLEEN HOOK, PRECIOUS
COMMODITIES, INC., NATIONAL COIN
BROKER, INC. and NCB WHOLESALE CO.

Defendants.

Case No. 1:21-cv-5707-LJL

**ORDER FOR JUDGMENT BY DEFAULT, PERMANENT INJUNCTION, CIVIL
MONETARY PENALTIES, AND OTHER STATUTORY AND EQUITABLE RELIEF
AGAINST DEFENDANTS ROBERT JEFFREY JOHNSON, KATHLEEN HOOK,
PRECIOUS COMMODITIES, INC., AND NCB WHOLESALE CO.**

On July 1, 2021, Plaintiff Commodity Futures Trading Commission ("CFTC" or

"Commission") filed a Complaint charging Defendants Robert Jeffrey Johnson ("Johnson"),

Kathleen Hook ("Hook"), Precious Commodities, Inc. ("PCI"), and NCB Wholesale Co.

("NCBWC") (collectively, "Defaulting Defendants"), with violating Sections 6(c)(1) of the

Commodity Exchange Act ("Act"), 7 U.S.C. § 9(1) , and CFTC Regulation ("Regulation")

180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2024).[1]  On September 21, 2021, the CFTC

amended its Complaint to add allegations that Hook and NCBWC were concealing their

whereabouts to evade service of the Commission's Complaint ("Amended Complaint").  ECF

---

[1] Defendants Ross Baldwin and National Coin Broker, Inc. answered the Complaint on October 15, 2021.  ECF No. 48.

No. 33.  The Amended Complaint did not alter substantive allegations in the Complaint, or add additional substantive allegations, with respect to the Defaulting Defendants.

On July 22, 2021, PCI was properly served with the summons and the Complaint pursuant to Fed. R. Civ. P. 4(e)(1) and 4(h)(1)(A) via service on the Secretary of State of New York as agent upon whom process may be served pursuant to New York Business Corporation Law § 307.  ECF No. 40.  The CFTC served the Amended Complaint on PCI on September 22, 2021.  ECF No. 42.

On July 29, 2021, Johnson executed a Waiver of the Service of Summons, and pursuant to Fed. R. Civ. P. 4(d)(4), on August 23, 2021, the CFTC filed the Waiver of the Service of Summons.  ECF No. 22.  On September 22, 2021, the CFTC served the Amended Complaint on Johnson.  ECF No. 42.

On September 22, 2021, Hook was properly served with the summons and the Amended Complaint pursuant to Fed. R. Civ. P. 4(e)(1) via the Secretary of State of Florida as agent upon whom process may be served pursuant to Fla. Stat. §§ 48.161 and 48.181. ECF Nos. 39, 41.

On September 22, 2021, NCBWC was properly served with the summons and the Amended Complaint pursuant to Fed. R. Civ. P. 4(e)(1) and 4(h)(1)(A) via the Secretary of State of Florida as agent upon whom process may be served pursuant to Fla. Stat. §§ 48.161 and 48.181.  ECF Nos. 39, 41.

Defaulting Defendants have failed to appear or answer within the time permitted by Fed. R. Civ. P. 12(a)(1).  Accordingly, the CFTC filed motions for entry of a clerk's default against Defaulting Defendants.  On October 2, 2023, the Clerk of this Court entered certificates of default as to Defaulting Defendants.  (ECF Nos. 76-79.)

The CFTC has moved this Court to grant final judgment by default against Defaulting Defendants, order permanent injunctive relief, and impose a restitution obligation and civil monetary penalty.

The Court has carefully considered the Amended Complaint, the allegations of which are well-pleaded and hereby taken as true, the CFTC's memorandum in support of its motion, and the record in this case, and the Court being otherwise advised in the premises, it is hereby:

**ORDERED** that the CFTC's Motion for Judgment by Default, Permanent Injunction, Civil Monetary Penalties, and Other Statutory and Equitable Relied Against Defaulting Defendants is **GRANTED**. Accordingly, the Court enters findings of fact, conclusions of law, and an Order of Final Judgment by Default for Permanent Injunction, Civil Monetary Penalties, and Other Statutory and Equitable Relief ("Order") pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, as set forth herein.

## I.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.    Findings of Fact

**The Parties**

1.    **Plaintiff Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with administering and enforcing the Act, 7 U.S.C. §§ 1–26, and the Regulations promulgated thereunder, 17 C.F.R. pts. 1–190 (2024).

2.    **Defaulting Defendant Robert Jeffrey Johnson** was a control person for PCI and has been integrally involved in all aspects of the Silver Lease Program. In 2012, Johnson pleaded guilty in the U.S. District Court for the Southern District of Ohio to bank fraud, destruction, alteration, or falsification of records in federal investigations, and willful failure to collect or pay over taxes. *Plea Agreement, United States. v. Johnson*, No. 2:10-CR-223-GLF-1 (S.D. Ohio, Sept. 27, 2012), ECF No. 83. Johnson was sentenced to 15 months in federal prison

followed by three years supervised release.  Minute Order, *United States v. Johnson*, ECF No. 97.  Johnson is married to Hook's daughter and has never been registered with the CFTC in any capacity.  Amended Complaint ¶ 26.

3.      **Defaulting Defendant Kathleen Hook** was the incorporator of NCBWC and has served as NCBWC's President, registered representative and sole officer.  In addition, Hook was registrant for PCI's website, used a PCI email address, and prepared PCI's taxes over the course of years.  She has been authorized signer on NCBWC's bank account, and NCBWC bank account opening documents identified her as NCBWC's owner and controlling person.  Hook has never been registered with the CFTC in any capacity.  Hook is the mother of Johnson's wife. *Id.* ¶ 28.

4.      **Defaulting Defendant Precious Commodities, Inc.** was a Florida corporation, incorporated on or about June 20, 2014, with a last known address in Ft. Lauderdale, Florida.  It was dissolved administratively by the Florida Secretary of State on September 25, 2020 for failing to file its 2020 annual report.  PCI has never been registered with the CFTC in any capacity. *Id.* ¶ 29.

5.      **Defaulting Defendant NCB Wholesale Co.** was a Florida corporation, incorporated on or about June 17, 2014 by Hook, with a last known address in Miami Beach, Florida.  Hook has served as the company President, registered agent and sole officer.  NCBWC made numerous payments of Investor funds to PCI, to or for the benefit of Hook, Johnson, entities associated with them, or their family.  NCBWC has never been registered with the CFTC in any capacity. *Id.* ¶ 31.

**The Silver Lease Program**

6. From approximately June 2014 through at least October 2019 (the "Relevant Period"), Defaulting Defendants directly or indirectly engaged in a fraudulent and deceptive scheme to solicit and misappropriate millions of dollars in cash and silver from members of the public ("Investors") in connection with a purported precious metals leasing program known as the "Silver Lease Program" or "Program." *Id*. ¶¶ 1-2, 153-72.

7. In addition to Johnson being directly liable for the fraudulent scheme, Hook and Johnson are liable as control persons by virtue of their control over NCBWC and PCI,[2] respectively, and failing to act in good faith or knowingly inducing the fraud. *Id*. ¶ 2, 153-72.

8. An Investor could participate in the Silver Lease Program in one of two ways: he or she could either (1) pay funds (or other precious metals) into the Program which were purportedly used to purchase silver on the Investor's behalf, or (2) send in silver that the Investor already owned. *Id*. ¶ 33-34. Either way, Investors in the Program were told that they would earn a monthly dividend in exchange for PCI's use of their silver. *Id*. ¶¶ 5-6.

9. Investors were misled in a number of ways. PCI represented that investments were guaranteed and fully insured and that Investors' silver would be stored by PCI securely in a storage facility referred to as a vault ("Storage Facility"). *Id*. ¶ 7, 60–65.

10. In reality, the Silver Lease Program was a complete fiction because PCI never operated or maintained a vault or secure storage facility capable of storing silver in the manner represented to Investors. *Id*. ¶ 8.

---

[2] PCI and NCBWC (along with a non-defaulting defendant, NCB) operated the scheme as a common enterprise, which was controlled by Hook and Johnson. Amended Complaint ¶¶ 3, 121. PCI and NCBWC transferred Investor funds between them. *Id*. ¶ 122. PCI and NCBWC did not conduct business at arm's length or observe corporate formalities, but rather were commonly controlled and shared employees, consultants, or agents, including, among others, Johnson and Hook. *Id*. ¶ 123.

11.     Moreover, funds and metals invested by Investors to purchase silver, as well as any metals pledged to the Program by Investors, were simply misappropriated, including by payments to or for the benefit of entities associated with Johnson, Hook, or their family.  *Id.* ¶ 9.

**PCI's False Statements and Scheme to Obtain**
**Insurance to Make the Program Appear Legitimate and Safe**

12.     PCI made numerous false and misleading statements on its website, including false statements about PCI's business activities (i.e., that it bought and sold metal), false statements about PCI's supposed storage of Investors' metal, and false or misleading statements that all metal was fully insured.  *Id.* ¶ 10.

13.     For example, PCI represented that metals in the Program were used to "quickly fulfill new purchases" and that PCI "return[ed] your metals once [PCI's] stock is replenished"; and that "all metals are fully allocated and held off the balance sheet."  *Id.* ¶ 61.

14.     The website also sought to entice potential Investors with an offer of a "3.9% ROI" and claimed that it paid a "a premium for every ounce pledged to the lease program equal to 3.9% of the value of your metals."  *Id.*

15.     PCI'S website also claimed that "*[o]ur vault* uses cutting edge security technology [emphasis added]," that there was "no human access to the storage areas," "unparalleled security features," and "the best defense against theft."  *Id.*  ¶ 62.

16.     All of these statements were false because PCI never functioned as a depository, never maintained any storage facility, did not engage in any legitimate leasing business, and stole Investor funds and silver.  *Id.* ¶¶ 64–65, 117–18.

17.     Although PCI claimed on its website that "all metals [were] fully insured," because PCI sought insurance coverage when it had never stored metal for Investors, PCI's insurance policies did not in fact provide actual protection to Investors.  *Id.* ¶¶ 63, 88.

18.     PCI obtained the insurance in furtherance of the scheme to lull Investors into believing that their investments would be safe.  *Id.* ¶¶ 66, 88.

19.     In addition, PCI engaged in a fraudulent scheme to obtain insurance policies, providing false information to two New York City-based insurance brokers concerning PCI's business and concealing Johnson's involvement and prior conviction and prison sentence for, among other things, bank fraud.  *Id.* ¶ 84.

**NCBWC and PCI Misappropriated Investor Funds and Metal**

20.     During the Relevant Period, millions of dollars in Investor funds were transferred to NCBWC; NCBWC did not use those funds to purchase silver on behalf of Program Investors, but rather diverted those funds for other uses.  *Id.* ¶¶ 111–12.

21.     NCBWC misappropriated Investor funds by, among other things, transferring funds to or for the benefit of, among others, entities associated with Johnson and Hook or their family.  *Id.* ¶ 114.

22.     In addition, NCBWC transferred more than $1 million to PCI.  *Id.* ¶ 115.  PCI used those funds to make "dividend" payments to Investors, but those payments were not generated by virtue of any legitimate business operations, but rather were Ponzi-style payments. *Id.*  ¶ 116.

23.     PCI also misappropriated metal pledged to the Program by Investors.  *Id.* ¶ 118.

24.     PCI largely ceased making purported "dividend" payments to Investors in the Spring of 2019; and, as of the date of filing this action, Silver Lease Program Investors had been unable to obtain their silver, in like weight and grade, or the dollar value thereof.  *Id.* ¶¶ 119–20.

**Johnson and Hook Controlled the Silver Lease Program Common Enterprise**

25.     Johnson and Hook sent and received numerous emails relating to the operation of

the Silver Lease Program, including emails relating to: (1) the payment of purported monthly dividends; (2) purported Silver Lease Program lease agreements; (3) PCI's website; (4) the purported storage of silver on behalf of Investors; (5) summaries of Investor information (including the amounts invested, amounts of silver purportedly pledged to the Program, and the amounts of purported monthly dividends); (6) PCI's insurance policies; and (7) IRA accounts. *Id.* ¶ 128.

26.     Johnson controlled the day-to-day operations of PCI and the Silver Lease Program, and Hook was involved in, and controlled key aspects of the recordkeeping and operations of PCI, NCBWC, and the Silver Lease Program. *Id.* ¶ 129.

27.     For his part, Johnson engaged in a scheme to set up and maintain PCI's website, which contained false information. He also engaged in a deceptive scheme to obtain, and retain, an insurance policy for PCI that could be used to promote the Silver Lease Program as fully insured to give Investors the impression that their investments were safe. Further, Johnson directed another Program employee that metals to be stored by PCI should be shipped to Johnson's home address, approved changes to be made to a PCI lease agreement, and directed responses (and in some cases ghostwriting responses) to an IRA custodian that had requested a way to verify that the Storage Facility was "actually in possession of these metals." *Id.* ¶¶ 129, 162.

28.     Hook was the President, registered representative and sole officer of NCBWC, signer on NCBWC's bank account, took an active role in monitoring Silver Lease Program transactions, reviewed lease agreements, matched lease agreements with incoming deposits, and emailed Johnson regarding contract expirations and other issues pertaining to lease agreements. *Id.* ¶¶ 130–32.

29.     Hook was also identified as registrant for PCI's website, used a PCI email address, prepared PCI's taxes over the course of years, and at times instructed PCI's virtual office provider to send PCI's mail to her own office.  *Id.* ¶¶ 133–34.

**B.    Conclusions of Law**

**Jurisdiction and Venue**

30.     This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, which provides that whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder, the Commission may bring an action in the proper district court of the United States against such person to enjoin such act or practice, or to enforce compliance with the Act, or any rule, regulation or order thereunder.  This Court also has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1345 (United States as plaintiff).

31.     The Court has personal jurisdiction over Defaulting Defendants Johnson, Hook, PCI, and NCBWC.  The Due Process Clause of the Fifth Amendment has two related components:  the "minimum contacts inquiry" and the "reasonableness inquiry," both of which are satisfied here.  As to minimum contacts, the well-pleaded allegations of the Amended Complaint establish that the Defaulting Defendants operated the Silver Lease Program common enterprise in the United States.  Further, the reasonableness inquiry is largely academic in non-diversity cases brought under a federal law which provides for nationwide service of process because of the strong federal interests involved.

32.     Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e), because the Defendants transacted business in this jurisdiction and acts and practices in violation of the Act and Regulations occurred within this District, among other places.

**Fraud by Deceptive Device or Contrivance:  Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2024)**

33.    The precious metals discussed in the Amended Complaint are commodities as defined by Section 1a(9) of the Act, 7 U.S.C. § 1a(9).

34.    7 U.S.C. § 9(1), makes it unlawful for any person, directly or indirectly, to:

[U]se or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after [July 21, 2010, the date of enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act].

35.    17 C.F.R. § 180.1(a)(1)-(3) provides, in part:

It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

(1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

(2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or]

(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

36.    During the Relevant Period, as described above, PCI violated 7 U.S.C. § 9(1) and 17 C.F.R. 180.1(a)(1)-(3) by, among other things, in connection with contracts of sale of commodities in interstate commerce (e.g., silver), making or attempting to make untrue or misleading statements of material fact or omitting to state or attempting to omit material facts necessary in order to make statements made not untrue or misleading, including by:

a.    Making numerous false and misleading statements on its website, including that "Precious Commodities Inc. specializes in precious metals" and that PCI "buy[s]

and sell[s] precious metals," that Investors' metal was used to "quickly fulfill new purchases," that PCI "return[ed] your metals once [PCI's] stock is replenished," that "all metals are fully allocated and held off the balance sheet," that PCI offered a "3.9% ROI," and that PCI paid "a premium for every ounce pledged to the lease program equal to 3.9% of the value of your metals."

b. Making numerous false and misleading statements regarding how Investor metal would be stored, including claiming "*[o]ur vault* uses cutting edge security technology," touting "high tech vault storage" (emphasis added), and claiming that "with no human access to the storage areas and unparalleled security features, we provide the best defense against theft, vandalism and natural disasters."

c. Making numerous false and misleading statements that "all metals are fully insured."

d. All of these statements were false and misleading because PCI never bought and sold precious metals in connection with the Silver Lease Program and never stored, or had the capability securely to store, in any vault or other storage facility metal on behalf Investors.

37.    During the Relevant Period, as described above, PCI further violated 7 U.S.C. § 9(1) and 17 C.F.R § 180.1(a)(1)-(3) by, among other things, in connection with contracts of sale of commodities in interstate commerce (e.g., silver), using or employing, or attempting to use or employ, a device, scheme, or artifice to defraud and engaging, or attempting to engage, in an act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person, including by:

a.      Receiving Investor funds from NCBWC and using those funds to make monthly

payments to Investors that purported to be dividend payments, but which were in

fact Ponzi-style payments reflecting other Investors' funds;

b.      Misappropriating metal pledged to the Program by Investors; and

c.      Obtaining insurance policies through two insurance brokers under false pretenses,

including that metal pledged to the Program would be securely stored in the

Storage Facility, in order to deceive Investors that their investments were insured.

38.     During the Relevant Period, as described above, NCBWC violated 7 U.S.C.

§ 9(1) and 17 C.F.R § 180.1(a)(1)-(3) by, among other things, in connection with contracts of

sale of commodities in interstate commerce (e.g., silver), using or employing, or attempting to

use or employ, a device, scheme, or artifice to defraud and engaging, or attempting to engage, in

an act, practice, or course of business, which operates or would operate as a fraud or deceit upon

any person, including by:

a.      Receiving Investor funds and misappropriating those funds, including using those

funds to make payments to PCI (which PCI used to make Ponzi-style payments to

Investors), to or for the benefit entities associated with Hook or her family, or to or

for the benefit of entities associated with Johnson or his family.

39.     During the Relevant Period, as described above, Johnson violated 7 U.S.C. § 9(1)

and 17 C.F.R § 180.1(a)(1)-(3) by, among other things, in connection with contracts of sale of

commodities in interstate commerce (e.g., silver), using or employing, or attempting to use or

employ, a device, scheme, or artifice to defraud and engaging, or attempting to engage, in an act,

practice, or course of business, which operates or would operate as a fraud or deceit upon any

person, including by:

a.    Engaging in a deceptive scheme to set up, and maintain PCI's website, which contained false information to obtain Investors;

b.    Engaging in a deceptive scheme to obtain, and retain, insurance policies for PCI that could be used to promote the Program as fully insured, including by causing false and misleading statements to be made to two insurance brokers (including the representation that metal would be securely stored at the Storage Facility and false or misleading statements about PCI's management) in order to obtain purported insurance to deceive Investors that their investments were safe; and

c.    Engaging in a deceptive scheme to associate PCI with an IRA custodian, and maintain association with an IRA Custodian, so that the Program could be offered to Investors who would be investing retirement funds through individual retirement accounts, including by making statements that PCI securely stored metals at the Storage Facility.

40.    Defaulting Defendants engaged in the acts and practices described above intentionally and recklessly.

41.    The foregoing acts, omissions, and failures of PCI's employees and agents, including Johnson, have occurred within the scope of their employment, agency, or office with PCI.  Therefore, PCI is liable, pursuant to Section 2(a)(l)(B) of the Act, 7 U.S.C. § 2(a)(l)(B), and Regulation 1.2, 17 C.F.R. § 1.2, as principal for the violative actions and omissions of PCI's employees and agents, including Johnson.

42.    The foregoing acts, omissions, and failures of NCBWC's employees and agents, including Hook, have occurred within the scope of their employment, agency, or office with NCBWC.  Therefore, NCBWC is liable, pursuant to 7 U.S.C. § 2(a)(l)(B) and 17 C.F.R. § 1.2, as

principal for the violative actions and omissions of NCBWC's employees and agents, including Hook.

43.     Johnson has controlled PCI, directly or indirectly, and has not acted in good faith or has knowingly induced PCI's violations of 7 U.S.C. § 9(1) and 17 C.F.R § 180.1(a)(1)-(3). Johnson is therefore liable for PCI's violations of 7 U.S.C. § 9(1) and 17 C.F.R § 180.1(a)(1)-(3), pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

44.     Hook has controlled NCBWC, directly or indirectly, and has not acted in good faith or has knowingly induced NCBWC's violations of 7 U.S.C. § 9(1) and 17 C.F.R § 180.1(a)(1)-(3).  Hook is therefore liable for NCBWC's violations of 7 U.S.C. § 9(1) and 17 C.F.R § 180.1(a)(1)-(3), pursuant to 7 U.S.C. § 13c(b).

45.     Because PCI and NCBWC operated as a common enterprise, each is liable for the violative acts of each member of the enterprise.

46.     Because Johnson and Hook controlled the common enterprise, they are liable, as control persons, for the violative acts of each member of the enterprise.

47.     Unless restrained and enjoined by this Court, there is a reasonable likelihood that Defaulting Defendants will continue to engage in the acts and practices alleged in the Amended Complaint and in similar acts and practices in violation of the Act and Regulations.

## II.    PERMANENT INJUNCTION

**IT IS HEREBY ORDERED THAT:**

48.     Based upon and in connection with the foregoing conduct, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, Defaulting Defendants are permanently restrained, enjoined and prohibited from directly or indirectly, in connection with any swap, or a contract of sale of any

commodity in interstate commerce, or for future delivery on or subject to the rules of any

registered entity:

    a.    using or employing, or attempting to use or employ, any manipulative or

        deceptive device or contrivance, in contravention of such rules and regulations as

        the Commission shall promulgate, in violation of Section 6(c)(1) of the Act, 7

        U.S.C. § 9(1); and

    b.    intentionally or recklessly: (1) using or employing, or attempting to use or

        employ, any manipulative device, scheme, or artifice to defraud; (2) making, or

        attempting to make, any untrue or misleading statement of a material fact or to

        omit to state a material fact necessary in order to make the statements made not

        untrue or misleading; or (3) engaging, or attempting to engage, in any act,

        practice, or course of business, which operates or would operate as a fraud or

        deceit upon any person, in violation of Regulation 180.1(a)(1)-(3), 17 C.F.R.

        § 180.1(a)(1)-(3).

49.    Defaulting Defendants are also permanently restrained, enjoined and prohibited

from directly or indirectly:

    a.    Trading on or subject to the rules of any registered entity (as that term is defined

        in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2024));

    b.    Entering into any transactions involving "commodity interests" (as that term is

        defined in Regulation 1.3, 17 C.F.R. § 1.3 (2024)), for their own personal account

        or for any account in which they have a direct or indirect interest;

    c.    Having any commodity interests traded on their behalf;

d.      Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

e.      Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

f.      Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2024); and/or

g.      Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2024)), agent or any other officer or employee of any person (as that term is defined in 7 U.S.C. § 1a(38)), registered, exempted from registration or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9).

### III.    RESTITUTION AND CIVIL MONETARY PENALTY

**A.    Restitution**

50.      Defaulting Defendants shall pay, jointly and severally, restitution in the amount of six million, nine hundred twenty-three thousand, nine hundred nineteen dollars and forty-two cents ($6,923,919.42) ("Restitution Obligation").  If the Restitution Obligation is not paid immediately, post-judgment interest shall accrue on the Restitution Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961.

16

51.     This Court recognizes that Johnson and Hook have been ordered to pay restitution

in a separate, parallel criminal matter involving the same fraudulent Silver Lease Program,

*United States v. Johnson, et. al.*, Case No. 21 Cr. 428 (ER) (S.D.N.Y.) ("Criminal Action").

For amounts disbursed to Program Investors as a result of satisfaction of any restitution ordered

in the Criminal Action, Defaulting Defendants shall receive a dollar-for-dollar credit against the

Restitution Obligation.  Within ten days of disbursement in the Criminal Action to Program

Investors, Defaulting Defendants shall, under a cover letter that identifies the name and docket

number of this proceeding, transmit to the Chief Financial Officer, Commodity Futures Trading

Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581, and the

Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800,

Chicago, Illinois 60606, copies of the form of payment to those Investors.

52.     To effect payment of the Restitution Obligation and the distribution of any

restitution payments to Defaulting Defendants Investors, the Court appoints the National Futures

Association ("NFA") as Monitor ("Monitor").  The Monitor shall receive restitution payments

from Defaulting Defendants and make distributions as set forth below.  Because the Monitor is

acting as an officer of this Court in performing these services, the NFA shall not be liable for any

action or inaction arising from NFA's appointment as Monitor, other than actions involving

fraud.

53.     The Defaulting Defendants shall make Restitution Obligation payments, and any

post-judgment interest payments, under this Order to the Monitor in the name "*CFTC v.

Baldwin, et al.* (SDNY, 21-cv-5707-LJL) – Restitution Fund" and shall send such payments by

electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's check, or

bank money order, to the Office of Administration, National Futures Association, 300 South

Riverside Plaza, Suite 1800, Chicago, Illinois 60606 under cover letter that identifies the paying Defendant and the name and docket number of this proceeding. The Defaulting Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581 and Manal M. Sultan, Deputy Director, 290 Broadway, 6th Floor, New York, NY 10007. Defaulting Defendants' Restitution Obligation shall be credited dollar-for-dollar for any amounts paid to the Monitor, by any defendant in this action, in the name "*CFTC v. Baldwin, et al.* (SDNY, 21-cv-5707-LJL) – Restitution Fund."

54. The Monitor shall oversee the Restitution Obligation and shall have the discretion to determine the manner of distribution of such funds in an equitable fashion to the Investors identified by the CFTC or may defer distribution until such time as the Monitor deems appropriate. In the event that the amount of Restitution Obligation payments to the Monitor are of a de minimis nature such that the Monitor determines that the administrative cost of making a distribution to eligible customers is impractical, the Monitor may, in its discretion, treat such restitution payments as civil monetary penalty payments, which the Monitor shall forward to the CFTC following the instructions for civil monetary penalty payments set forth in Part III.B below.

55. Defaulting Defendants shall cooperate with the Monitor as appropriate to provide such information as the Monitor deems necessary and appropriate to identify Program Investors to whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of any Restitution Obligation payments. Defaulting Defendants shall execute any documents necessary to release funds that they have in any repository, bank, investment or other financial

institution, wherever located, in order to make partial or total payment toward the Restitution Obligation.

56.     The Monitor shall provide the Commission at the beginning of each calendar year with a report detailing the disbursement of funds to Defaulting Defendants' customers during the previous year.  The Monitor shall transmit this report under a cover letter that identifies the name and docket number of this proceeding to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

57.     The amounts payable to each Investor shall not limit the ability of any Investor from proving that a greater amount is owed from Defaulting Defendants or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any Investor that exist under state or common law.

58.     Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each Program Investor who suffered a loss is explicitly made an intended third-party beneficiary of this Order and may seek to enforce obedience of this Order to obtain satisfaction of any portion of the restitution that has not been paid by Defaulting Defendants to ensure continued compliance with any provision of this Order and to hold Defaulting Defendants in contempt for any violations of any provision of this Order.

59.     To the extent that  any funds accrue to the U.S. Treasury for satisfaction of Defaulting Defendants' Restitution Obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth above.

**B.      Civil Monetary Penalty**

60.     Defaulting Defendants shall pay, jointly and severally, a civil monetary penalty in the amount of eleven million five hundred thousand dollars ($11,500,000.00) ("CMP

Obligation").  If the CMP Obligation is not paid immediately, then post-judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961.

61.    Defaulting Defendants shall pay their CMP Obligation and any post-judgment interest, by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order.  If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> MMAC/ESC/AMK326
> Commodity Futures Trading Commission
> Division of Enforcement
> 6500 S. MacArthur Blvd.
> HQ Room 181
> Oklahoma City, OK 73169
> 9-AMC-AR-CFTC@faa.gov

If payment by electronic funds transfer is chosen, a Defaulting Defendant shall contact the Federal Aviation Administration at the address above to receive payment instructions and shall fully comply with those instructions.  Defaulting Defendants shall accompany payment of the CMP Obligation with a cover letter that identifies the Defaulting Defendant and the name and docket number of this proceeding.  Defaulting Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

## C.    Provision Related to Monetary Sanctions

62.    Partial Satisfaction:  Acceptance by the CFTC or the Monitor of any partial payment of Defaulting Defendants' Restitution or CMP Obligation shall not be deemed a waiver

of their obligation to make further payments pursuant to this Order, or a waiver of the CFTC's

right to seek to compel payment of any remaining balance.

## IV.    MISCELLANEOUS PROVISIONS

63.    Notice:  All notices required to be given by any provision in this Order shall be

sent certified mail, return receipt requested, as follows:

Notice to CFTC:

> Manal M. Sultan, Deputy Director
> Division of Enforcement
> Commodity Futures Trading Commission
> 290 Broadway, 6th Floor
> New York, NY 10007

Notice to Johnson:

> Robert Jeffrey Johnson
> Register Number 84299-004
> FCI Miami
> 15801 S.W. 137th Avenue
> Miami, FL 33177

Notice to Hook:

> Kathleen Hook
> 609 2nd Street, Apt. 127
> West Palm Beach, FL  33401

Notice to PCI:

> Precious Commodities, Inc.
> 401 E. Las Olas Blvd
> Suite 1400
> Fort Lauderdale, FL 33301

Notice to NCBWC:

> Kathleen Hook
> 1688 Meridian Ave. # 700
> Miami Beach, FL 33139

All such notices to the Commission shall reference the name and docket number of this action.

64.     Change of Address/Phone:  Until such time as Defaulting Defendants satisfy in full their Restitution and CMP Obligations as set forth in this Order, Defaulting Defendants shall provide written notice to the Commission by certified mail of any change to their telephone number and mailing address within ten calendar days of the change.

65.     Invalidation: If any provision of this Order or if the application of any provision or circumstance is held invalid, then the remainder of this Order and the application of the provision to any other person or circumstance shall not be affected by the holding

66.     Continuing Jurisdiction of this Court:  This Court shall retain jurisdiction of this action in order to ensure compliance with this Order and for all other purposes related to this action, including any motion by Defaulting Defendants to modify or for relief from the terms of this Order.

67.     Injunctive and Equitable Relief Provisions: The injunctive and equitable relief provisions of this Order shall be binding upon Defaulting Defendants, upon any person under the authority or control of any of the Defaulting Defendants, and upon any person who receives actual notice of this Order, by personal service, e-mail, facsimile or otherwise insofar as he or she is acting in active concert or participation with Defaulting Defendants.

There being no just reason for delay, the Clerk of the Court is hereby ordered to enter this *Order for Judgment by Default, Permanent Injunction, Civil Monetary Penalties, and Other Statutory and Equitable Relief Against Defendants Robert Jeffrey Johnson, Kathleen Hook, Precious Commodities, Inc., and NCB Wholesale Co.* forthwith and without further notice.

**IT IS SO ORDERED** on this __8th___day of _____April_____, 2025.

_____
Hon. Lewis J. Liman,
**UNITED STATES DISTRICT JUDGE**