UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COMMODITY FUTURES TRADING
COMMISSION,

Plaintiff,

v.

ROSS BALDWIN, ROBERT JEFFREY
JOHNSON, KATHLEEN HOOK, PRECIOUS
COMMODITIES, INC., NATIONAL COIN
BROKER, INC. and NCB WHOLESALE CO.

Defendants.

Case No. 21-cv-5707-LJL

**CONSENT ORDER FOR PERMANENT INJUNCTION AND OTHER EQUITABLE
RELIEF AGAINST DEFENDANTS ROSS BALDWIN AND
NATIONAL COIN BROKER, INC.**

## I.    INTRODUCTION

On July 1, 2021, Plaintiff Commodity Futures Trading Commission ("Commission" or

"CFTC") filed a Complaint against, among others, Defendants Ross Baldwin ("Baldwin") and

National Coin Broker, Inc. ("NCB") (together, the "Settling Defendants"), for violations of

Section 6(c)(1) of the Commodity Exchange Act (the "Act"), 7 U.S.C. § 9(1) , and CFTC

Regulation ("Regulation") 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2024).  ECF Docket

No. 1.  On September 21, 2021, the CFTC amended its Complaint to add allegations that two of

Settling Defendants' co-defendants, Kathleen Hook and NCB Wholesale Co., were concealing

their whereabouts to evade service of the CFTC's Complaint, and did not otherwise alter or add

substantive allegations in the Complaint as to Settling Defendants.  ECF Docket No. 33.  On

October 21, 2021, the Settling Defendants answered the Amended Complaint.

## II.    CONSENTS AND AGREEMENTS

To effect settlement of all charges alleged in the Amended Complaint against Settling Defendants, without a trial on the merits or any further judicial proceedings, Settling Defendants:

1.    Consent to the entry of this Consent Order for Permanent Injunction and Other Equitable Relief Against Defendants Ross Baldwin and National Coin Broker, Inc. ("Consent Order");

2.    Affirm that they have read and agreed to this Consent Order voluntarily, and that no promise, other than as specifically contained herein, or threat, has been made by the CFTC or any member, officer, agent, or representative thereof, or by any other person, to induce consent to this Consent Order;

3.    Acknowledge service of the summons and the Amended Complaint;

4.    Admit the jurisdiction of this Court over them and the subject matter of this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1;

5.    Admit the jurisdiction of the CFTC over the conduct and transactions at issue in this action pursuant to the Act;

6.    Admit that venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e);

7.    Waive:

    a.    Any and all claims that they may possess under the Equal Access to Justice Act, 5 U.S.C. § 504  and 28 U.S.C. § 2412, and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Regulations, 17 C.F.R. pt. 148 (2024), relating to, or arising from, this action;

    b.    Any and all claims that they may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, tit. II, §§ 201–253, 110 Stat. 847, 857–74 (codified as amended at 28 U.S.C. § 2412 and in scattered sections of 5 U.S.C. and 15 U.S.C.), relating to, or arising from, this action;

        c.       Any claim of Double Jeopardy based upon the institution of this action or the entry in this action of any order imposing a civil monetary penalty or any other relief, including this Consent Order; and

        d.       Any and all rights of appeal from this action;

8.      Agree that Settling Defendants are not prevailing parties in this action for purposes of the waiver of any and all rights under the Equal Access to Justice Act specified in subpart (a) of Paragraph 7.

9.      Consent to the continued jurisdiction of this Court over them for the purpose of implementing and enforcing the terms and conditions of this Consent Order and for any other purpose relevant to this action, even if the Settling Defendants, now or in the future, reside outside the jurisdiction of this Court;

10.      Agree that they will not oppose enforcement of this Consent Order on the ground, if any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure and hereby waives any objection based thereon;

11.      Agree that neither they nor any of their agents or employees under their authority or control shall take any action or make any public statement denying, directly or indirectly, any allegation in the Complaint, Amended Complaint or the Findings of Fact or Conclusions of Law in this Consent Order, or creating or tending to create the impression that the Complaint, Amended Complaint or this Consent Order is without a factual basis; provided, however, that nothing in this provision shall affect their: (a) testimonial obligations; or (b) right to take legal positions in other proceedings to which the CFTC is not a party. The Settling Defendants shall comply with this agreement, and shall undertake all steps necessary to ensure that all of their agents and/or employees under their authority or control understand and comply with this agreement;

12.     Admit to all the findings of fact and conclusions of law made in this Consent Order and all of the allegations in the Amended Complaint; and

13.     Agree that no provision of this Consent Order shall in any way limit or impair the ability of any other person or entity to seek any legal or equitable remedy against the Settling Defendants in any other proceeding.

### III.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

14.     The Court, being fully advised in the premises, finds that there is good cause for the entry of this Consent Order and that there is no just reason for delay.  The Court therefore directs the entry of the following Findings of Fact, Conclusions of Law, permanent injunction and equitable relief, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, as set forth herein.  The findings and conclusions in this Consent Order are not binding on any other party to this action.

**THE PARTIES AGREE AND THE COURT HEREBY FINDS**:

**A.    Findings of Fact**

**The Parties to this Consent Order**

15.     Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with administering and enforcing the Act and the Regulations.

16.     Settling Defendant **Ross Baldwin** was the sole officer, owner, operator and principal of NCB; has promoted a fraudulent silver lease program (referred to herein as the "Silver Lease Program" or the "Program"); and has communicated extensively with insurance brokers to obtain and maintain insurance coverage for metals ostensibly held for the benefit of persons who invested in the Silver Lease Program.  Baldwin has never been registered with the Commission in any capacity.

17.     In the parallel criminal case, *United States v. Johnson, et. al.*, No. 21-cr-428 (S.D.N.Y.) ("Criminal Action"), Baldwin pleaded guilty to a five count Indictment, charging him with (i) conspiring to commit wire fraud in connection with a scheme to defraud investors; (ii) conspiring to commit wire fraud in a scheme to defraud insurance companies; (iii) wire fraud in connection with the Silver Lease Program; (iv) wire fraud in connection with a scheme to defraud insurance companies; and (v) making false statements to officials of the CFTC during a sworn deposition.  Criminal Action, ECF Docket Nos. 2, 81.

18.     Settling Defendant **National Coin Broker, Inc.** is an inactive Florida corporation, which had been incorporated by Baldwin on or around April 23, 2009.  NCB's last known address was in Hallandale Beach, Florida.  NCB promoted the Silver Lease Program, received investor funds, and transmitted investor funds to another related company.  NCB has never been registered with the Commission in any capacity.

**The Silver Lease Program**

19.     From approximately June 2014 through at least October 2019 (the "Relevant Period"), Defendants, including Baldwin and NCB, engaged in a fraudulent and deceptive scheme to solicit millions of dollars in cash and silver from at least 60 members of the public in connection with the Silver Lease Program.

20.     An investor could participate in the Silver Lease Program in one of two ways: he or she could either (1) pay funds (or other precious metals) into the Program which were purportedly used to purchase silver on the investor's behalf, or (2) send in silver that the investor already owned.  Either way, investors in the Program were told that they would earn a monthly dividend in exchange for the Program's use of their silver.

21.    Investors were told that that their investments were guaranteed and fully insured and that their silver would be stored securely in a storage facility referred to as a vault ("Storage Facility"). In reality, the Silver Lease Program was a complete fiction because the Program never operated or maintained a vault or secure storage facility capable of storing silver in the manner represented to investors. Moreover, funds and metals invested by investors to purchase silver, as well as any metals pledged to the Program by investors, were simply misappropriated.

**Baldwin and NCB's Fraudulent Promotion of the Silver Lease Program**

22.    NCB solicited individuals to participate in the Silver Lease Program, received funds from investors, and purported to sell silver coins to investors to be pledged to the Silver Lease Program.

23.    During the Relevant Period, Baldwin was the owner, sole officer and registered representative for NCB and signer on NCB's bank accounts.

24.    During the Relevant Period, NCB funneled investor funds to another Program entity, which misappropriated those funds.

25.    NCB promotional materials described itself as a "nationally recognized, privately owned buyer and seller of precious metals buillion [sic] and coins" and described the Silver Lease Program: "[y]ou pledge your silver assets to be available for the leasing program[,]" "[w]e lease your silver for a few days to fulfill our orders[,]" "[o]nce we receive our silver, we put it back in your account[,]" and "[y]ou are paid a cash dividend every month your silver is leased under the program."

26.    NCB solicited prospective Silver Lease Program investors to purchase silver coins (typically American Silver Eagle one-ounce silver coins ("ASEs")) from NCB, to send their own ASEs to be pledged to the Program, or to send their own non-ASE silver, coins and/or other

precious metals to NCB that NCB in turn claimed to sell and use the proceeds to purchase ASEs that would be pledged to the Program.

27.     Investors looking to participate in the Program sent funds or other assets, such as coins and silver, worth thousands to hundreds of thousands of dollars, to NCB as part of their enrollment in the Silver Lease Program, in exchange for promised monthly "lease payments."

28.     Whether investors invested money to purchase ASEs, pledged their own ASEs, sent their own silver in the form of non-ASEs that would ostensibly be sold by NCB to purchase ASEs, investors were led to believe that their ASEs would be held in a secure vault and that investors would be paid a monthly dividend in exchange for the use of their silver.

29.     For those investors who sent money for the purpose of purchasing ASEs, the investors sent their funds to NCB.

30.     These investors were led to believe that NCB was purchasing ASEs on their behalf and that the ASEs would be pledged to the Program, including by the provision of invoices to investors indicating that NCB had supposedly sold ASEs to them.

31.     Instead of using investor funds to purchase silver for the investors' benefit, when Silver Lease Program investors transmitted funds to NCB for the purpose of purchasing ASEs to be pledged to the Program, NCB typically transmitted a portion of those funds to another Program entity, which in turn misappropriated the funds.

32.     NCB and Baldwin also promoted the Program through Baldwin's website, silverlease.com.

33.     The silverlease.com website falsely referred to the Program as "my program" and "my silver lease program."

7

34.    Similarly, the website represented that NCB was doing business as SilverLease.com.

35.    The silverlease.com website also stated "[a]s a bullion bank we receive large orders on a daily basis and in order to lock in these orders we must have physical Silver on hand. If we don't have the physical Silver on hand, we can't lock in the order to fulfill the transaction and we lose the sale. This is where the Silver Lease Program comes into play. Because you pledge your Silver to the Silver Lease Program, we always have physical Silver on hand and we're always able to fulfill our orders. You benefit because we will pay you a 3.9% to a 5% guaranteed cash dividend for the privilege of using your Silver!"

36.    The silverlease.com website further described the Silver Lease Program: "The process for how the Silver Lease Program works is very simple. One, we receive a large order for silver which we lock in. Two, we borrow the silver from you to fulfill the order. Three, we put the silver back in your account once we receive our silver order from the U.S. Mint within a few days."

37.    The website similarly stated that, "We simply borrow your Silver to fulfill large orders promptly. We then replace your Silver when we received our replacement order from the US Mint within a few days."

38.    NCB and Baldwin's representations describing the Program as "my" or NCB's Program were false and materially misleading, and they concealed a reality that Baldwin did not disclose, namely that one of his co-defendants was Baldwin's contact person for all aspects of the Silver Lease Program, that the co-defendant was involved in virtually every aspect of the Program, and that the co-defendant had been convicted and served prison time for, among other things, bank fraud.

39.     Baldwin's statements gave the false impression that he personally operated a legitimate business, which was a "bullion bank" that leased investors' metal, that Baldwin used investors' silver to fulfill large orders, and that he then replaced that metal.

40.     In sharp contrast to that picture, however, Baldwin stated to Commission staff during his investigate testimony, under penalty of perjury, that he was not involved in the borrowing or replacement of investors' silver and had never actually even seen any of the metal supposedly being stored on behalf of investors.

41.     The silverlease.com website also made numerous false and misleading statements regarding the supposed safety of the Program: "There is no other investment available to you that is guaranteed, insured and gives the return on investment that our Silver Lease Program does"; "We guarantee the program in writing, and we insure your Silver!"; "The full value of your silver is insured";  "Guaranteed and insured!"; "Are you looking for an investment that is guaranteed and insured?  We know what you are thinking . . . An investment that is both insured and guaranteed? That's not possible!"; "You will also be issued an insurance certificate covering the full value of your Silver at the start of the program. You will never have to worry about the loss of your investment"; and "Your Silver is independently insured."

42.     All of these statements were false because the Program never stored, or had the capability of storing, metal in a secure depository.

43.     Baldwin either knew that the Program did not store silver at the Storage Facility or, at a minimum, acted with reckless disregard as to whether the Program in fact held silver or not.

44.     Baldwin knew that the statements regarding the investment being guaranteed and insured were false or at the very least disregarded whether the statements were true or not.

9

45.     Notwithstanding Baldwin's representations to investors that their investments were insured and that they did not have to worry, Baldwin knew or else recklessly disregarded the fact, as set forth in more detail below that he had made false statements to two insurance brokers in connection with the acquisition of insurance policies in connection with the Program.

46.     NCB and Baldwin repeated these false claims in print brochures that NCB disseminated at trade shows.

47.     NCB's Silver Lease Program brochure claimed, for example: "Demand for Silver, espeically [sic] American Silver Eagles is so high, it can be difficult at times to source.  In order to source [obtain inventory] for new orders quickly, the silver I sell is borrowed from you.  You pledge your silver assets to be available for the leasing program.  We lease your silver for a few days to fulfill our orders.  Once we receive our silver we put it back in your account."

48.     The brochure's description of the Program was false because, as set forth above, Baldwin was not actually involved in the borrowing or replacement of investors' silver.

49.     The brochure also contained a false testimonial from "Emily D," purportedly claiming that "[t]he Lease Program allowed me to bring down my cost average while waiting for the price of silver to increase above what it paid for it.  Great Program!"

50.     Baldwin testified under penalty of perjury that "Emily D" was not actually a Program investor, but rather was "a marketing thing."

51.     The brochure also claimed that the Silver Lease Program "has been used by banks to earn money from their precious metals for a long time."

52.     This statement was false because, as Baldwin has stated under penalty of perjury, to his knowledge, no banks had ever used the Silver Lease Program.

53.     The brochure also claimed that investor silver was stored in a "vault" in a "segregated account."

54.     However, as set forth above, the Program never operated or maintained a vault or secure storage facility capable of storing silver for or on behalf of any Program investors.

55.     Baldwin knew his representations that silver was stored in a "vault" were false or at the very least he made the statements with complete disregard as to whether they were true or not: Baldwin testified under penalty of perjury that he had never seen any silver actually stored on behalf of Program investors or taken any steps at the time NCB was soliciting participation in the Program to verify whether or not the Program was in fact holding silver for or on behalf of investors.

56.     In addition, at various times during the Relevant Period, NCB, by and through Baldwin, claimed to investors that he would not charge a commission until silver rose to, typically, approximately $25 per ounce.

57.     Baldwin's statement regarding his compensation misleadingly reinforced the impression that Baldwin functioned solely as a buyer and seller of metal.

58.     By failing further to disclose that he, in fact, received thousands of dollars in compensation for his enrollment of investors in the Program, he misled investors as to his actual role and motivation for promoting the Silver Lease Program.

59.     Importantly, in his promotion of the Silver Lease Program, Baldwin never disclosed to investors or prospective investors his co-defendant's involvement with the Program or the fact that the co-defendant had been convicted of, and served a federal prison sentence, for among other things, bank fraud.

60.     Baldwin testified under penalty of perjury that he, Baldwin, was aware of his co-defendant's criminal conviction at the time Baldwin was promoting the Program and that the conviction was "something about taxes" and had "something to do with banks," but Baldwin did not disclose his co-defendant's criminal conviction to investors or prospective investors.

### Baldwin Provided False Information to Two Insurance Brokers to Obtain Insurance in Order to Make the Program Appear to Be a Safe Investment

61.     NCB claimed in promotional material that investors' silver was "100% insured." Similar claims that investor metals were "fully insured" were also repeated in email communications NCB and its sales representatives made to potential investors.

62.     Investors were also provided purported evidence or confirmation of insurance, specifying a supposed "vault number" associated with their individual silver holding.

63.     In order to give apparent credence to claims that Program investments were "fully insured" or "100% insured," Baldwin provided false information to two insurance brokers to secure insurance policies.

64.     The Program obtained an insurance policy (in the name of a co-defendant entity, referred to as Company A) through a New York-based insurance broker ("NY Insurance Broker-1"), which purported to cover silver stored at the Storage Facility.  In Company A's initial application for insurance with NY Insurance Broker-1, which was attached to an email copying, among others, Baldwin, Company A represented that Baldwin was an owner or principal of Company A.

65.     The text of the email provided that:  Company A "is going to serve as a storage depository for precious metals for IRA clients . . . Once we take possession of the metals, they will be held [at Storage Facility].  There will be no public access to the storage facility.  Only Ross Baldwin will interact with the metals should they need to be shipped out on the rare

occasion . . . I have also attached a pdf file describing the high security storage features provided by [the Storage Facility]."

66.     In connection with that application, Company A sought coverage of more than $2 million to insure silver purportedly stored in the Storage Facility.  Over time, Company A increased the coverage multiple times, which, by 2017 had grown to $7 million.

67.     Under the policies obtained and renewed through NY Insurance Broker-1, often at Baldwin's request, Insurance Broker-1 issued certain documentation typically referred to as "Evidence of Insurance" that were tailored to each Program investor, referred to the investor as a "Loss Payee," stated "[t]his is to evidence that: [Company A] . . . [h]as currently in force insurance for all risks of physical loss or damage . . . Precious Metals . . . .," and noted the investor's name, address, the dollar value of their silver and an individualized "Vault number."

68.     Baldwin provided NY Insurance Broker-1 the investor's account number, name, address, and amount of silver so the individualized insurance documents could be issued.

69.     Baldwin testified that it was important to him to get the individualized insurance documents "right away . . . so [investors] feel comfortable."

70.     Baldwin also regularly communicated with NY Insurance Broker-1 concerning the insurance policy, including about the coverage and issues regarding the payment of premiums.

71.     However, on or around July 24, 2018—after the Commission issued investigative subpoenas—Baldwin sought to distance himself from the Program insurance policy, claiming to NY Insurance Broker-1 that Company A "is not my company I only recommend you."

72.     NY Insurance Broker-1 replied to Baldwin: "[a]s you have been our only contact could you advise who the contact is?"

13

73.    After the policy with NY Insurance Broker-1 was not renewed, on or around October 5, 2018, Baldwin communicated with a second insurance broker, also located in New York ("NY Insurance Broker-2"), concerning Company A's business exposures and the need for an insurance quote.  According to NY Insurance Broker-2's record of the telephone call with Baldwin, Baldwin indicated that Company A needed only "[s]tatic risk coverage."  Static coverage means coverage limited to a fixed location and would not cover items in transport to or from the fixed location.

74.    Based on Baldwin's representations to NY Insurance Broker-2, Company A was issued an insurance policy in or around October 2018, providing Company A $7,000,000 in coverage for precious metals stored in the Storage Facility.  In connection with that application, Baldwin represented to NY Insurance Broke-2, falsely, that Baldwin was a manager of Company A.  In addition, Baldwin failed to disclose his co-defendant's involvement with Company A or his co-defendant's prior felony convictions (including for bank fraud).

75.    Baldwin's statements to NY Insurance Broker-2 that he was a manager of Company A were inconsistent with his previous statement to NY Insurance Broker-1 that "Company A is not my company" and subsequent statements to NY Insurance Broker-2.

76.    On or around October 10, 2018, Insurance Broker-2 emailed Baldwin stating "[o]ur compliance department have advised . . . while working on KYC [i.e., Know Your Customer] checks we are able to find various potential matches for [Individual-A]" and that "I'm not familiar with [Individual-A].  Is this person an owner of the company?"  Individual A was Baldwin's co-defendant's wife.  Baldwin forwarded the email to his co-defendant.  Baldwin responded to NY Insurance Broker-2's email on or around October 10, 2018, providing Individual-A's full name and date of birth and indicating that Individual-A was in "sales."

14

77.     Baldwin did not, however, disclose Individual-A's relationship to the co-defendant, the co-defendant's affiliation with Company A, or the co-defendant's prior criminal conviction for, among other things, bank fraud.

78.     On or around October 30, 2018, when asked by Commission staff during his sworn investigative testimony whether Individual-A had any role with Company A, Baldwin stated under penalty of perjury, "[n]ot to my knowledge."

79.     Baldwin engaged in a deceptive scheme when he took steps to acquire insurance on behalf of Company A while falsely claiming to be a manager of Company A; failed to disclose his co-defendant's association with Company A; failed to disclose his co-defendant's prior conviction and prison sentence for, among other things, bank fraud; made misleading statements in response to NY Insurance Broker-2's inquiry regarding Individual-A and her association with Company A that further obfuscated the co-defendant's association with Company A; and failed to disclose that he, Baldwin, either knew that Company A did not store any metal on behalf of customers at the Storage Facility or else that he did not know whether it was true or not.

80.     Baldwin concealed the truth about Company A's operations so that he could continue to provide Silver Lease Program investors supposed proof that their metals were fully insured.

81.     Under the policy obtained through NY Insurance Broker-2 and often at Baldwin's request, NY Insurance Broker-2 issued certain documentation, typically referred to as a "Confirmation of Insurance," that were tailored to each Program investor, indicated that the investor "is named under the Loss Payable section of the [Company A] Policy," indicated that Company A was the assured, indicated the "amount of insurance" (the purported value of silver

15

stored for the investor), noted that insurance covered "material at [Storage Facility]," and provided an individualized "vault number" for each investor.

## B.    Conclusions of Law

### Jurisdiction and Venue

82.    This Court possesses jurisdiction over this action pursuant to 28 U.S.C. § 1331 (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), provides that the Commission may bring actions for injunctive relief or to enforce compliance with the Act or any rule, regulation, or order thereunder in the proper district court of the United States whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

83.    Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e), because acts and practices in violation of the Act occurred within this District.

### Fraud by Deceptive Device or Contrivance

84.    Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), makes it unlawful for any person, directly or indirectly, to:

> use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after [July 21, 2010, the date of enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act] . . . .

85.    CFTC Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2024), provides, in relevant part: It shall be unlawful for any person, directly or indirectly, in connection with any swap, or

contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

    (1)    Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

    (2)    Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or]

    (3)    Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

86.    By the conduct described in paragraphs 1 through 85, above, NCB, by and through Baldwin, violated Section 6(c)(1) of the Act and Regulation 180.1(a) by, among other things, in connection with contracts of sale of commodities in interstate commerce (e.g., silver), making or attempting to make untrue or misleading statements of material fact or omitting to state or attempting to omit material facts necessary in order to make statements made not untrue or misleading, including:

    a.    Making false and misleading statements that investments in the Program were insured and guaranteed;

    b.    Using a false testimonial in a Silver Lease Program promotional brochure;

    c.    Representing that the Program was Baldwin's Program and that he, Baldwin, would use pledged silver to fulfill orders in exchange for a monthly dividend and failing to disclose his co-defendant's involvement or prior criminal conviction for bank fraud;

    d.    Providing investors documentation stating that Baldwin would not be paid a commission unless silver prices reached $25 per ounce but failing to disclose the thousands of dollars that Baldwin received in compensation to promote the Silver Lease Program;

   e. Representing, falsely, that silver pledged to the Program would be replaced by silver purchased by NCB and/or Baldwin from the U.S. Mint; and

   f. Representing, falsely, that NCB was a bouillon bank and that banks participated in the Program.

  87. By the conduct described in paragraphs 1 through 85, above, Baldwin further violated 7 U.S.C. § 9(1) and 17 C.F.R § 180.1(a)(1)-(3) by, among other things, in connection with contracts of sale of commodities in interstate commerce (e.g., silver), using or employing, or attempting to use or employ, a device, scheme, or artifice to defraud and engaging, or attempting to engage, in an act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person, including providing false information to NY Insurance Broker-1 and NY Insurance Broker-2—including but not limited false information as to the ownership and management of Company A and failing to disclose his co-defendant's role with Company A—in order to obtain purported insurance to deceive investors that their investments were safe.

  88. Baldwin and NCB engaged in the acts and practices described above intentionally and/or recklessly.

  89. Baldwin has controlled NCB, directly or indirectly, and has not acted in good faith or has knowingly induced NCB's violations of 7 U.S.C. § 9(1) and 17 C.F.R § 180.1(a). Baldwin is therefore liable for NCB's violations of 7 U.S.C. § 9(1) and 17 C.F.R § 180.1(a), pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

  90. The foregoing acts, omissions, and failures of NCB's employees and agents, including Baldwin, have occurred within the scope of their employment, agency, or office with

NCB. Therefore, NCB is liable, pursuant to 7 U.S.C. § 2(a)(l)(B) and 17 C.F.R. § 1.2 (2024), as principal for the violative actions and omissions of NCB's employees and agents, including Baldwin.

91.    Unless restrained and enjoined by this Court, there is a reasonable likelihood that Baldwin and NCB will continue to engage in the acts and practices alleged in the Amended Complaint and in similar acts and practices in violation of the Act and Regulations.

## IV.    PERMANENT INJUNCTION

**IT IS HEREBY ORDERED THAT:**

92.    Based upon and in connection with the foregoing conduct, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, Baldwin and NCB are permanently restrained, enjoined and prohibited from directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, intentionally or recklessly (1) using or employing, or attempting to use or employ, any manipulative device, scheme, or artifice to defraud; (2) making, or attempt to make, any untrue or misleading statement of a material fact or omitting to state a material fact necessary in order to make the statements made not untrue or misleading; or (3) engaging, or attempting to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person, in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2024);

93.    Baldwin and NCB are also permanently restrained, enjoined, and prohibited from directly or indirectly:

> a.    Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

b.  Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2024)), or precious metals that are commodities, for their own personal account or for any account in which they have a direct or indirect interest;

c.  Having any commodity interests, or precious metals that are commodities, traded on their behalf;

d.  Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests or precious metals that are commodities;

e.  Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests or precious metals that are commodities;

f.  Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2024); and/or

g.  Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2024)), agent or any other officer or employee of any person (as that term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38)), registered, exempted from registration or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9).

## V. RESTITUTION

### A.   Restitution

94.     The Settling Defendants shall pay, jointly and severally, restitution in the amount of six million nine hundred twenty-three thousand nine hundred nineteen dollars and forty-two cents ($6,923,919.42) ("Restitution Obligation").  If the Restitution Obligation is not paid immediately in full, post-judgment interest shall accrue on the Restitution Obligation beginning on the date of entry of this Consent Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Consent Order pursuant to 28 U.S.C. § 1961.

95.     Baldwin and his co-defendants in the Criminal Action (i.e., Jeffrey Johnson and Kathleen Hook), have been ordered to pay, jointly and severally, restitution in the amount of $6,934,701.92.

96.     For amounts disbursed to investors as a result of satisfaction of the restitution ordered in the Criminal Action, the Settling Defendants shall receive a dollar-for-dollar credit against their Restitution Obligation.  Within ten days of any disbursement in the Criminal Action to the investors, the Settling Defendants shall, under a cover letter that identifies the name and docket number of this proceeding, transmit to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581, and the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606, copies of the form of payment to the investors.

97.     To effect payment of the Restitution Obligation and the distribution of any restitution payments to the investors, the Court appoints the National Futures Association ("NFA") as Monitor ("Monitor").  The Monitor shall receive restitution payments from the Settling Defendants and make distributions as set forth below.  Because the Monitor is acting as

an officer of this Court in performing these services, the NFA shall not be liable for any action or inaction arising from NFA's appointment as Monitor, other than actions involving fraud.

98.     The Settling Defendants shall make Restitution Obligation payments, and any post-judgment interest payments, under this Consent Order to the Monitor in the name "*CFTC v. Baldwin, et al.* (SDNY, 21-cv-5707-LJL) – Restitution Fund" and shall send such payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's check, or bank money order, to the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606 under cover letter that identifies the paying Defendant and the name and docket number of this proceeding.  The Settling Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581 and Manal M. Sultan, Deputy Director, 290 Broadway, 6th Floor, New York, NY 10007.  Settling Defendants' Restitution Obligation shall be credited dollar-for-dollar for any amounts paid to the Monitor, by any defendant in this action, in the name "*CFTC v. Baldwin, et al.* (SDNY, 21-cv-5707-LJL) – Restitution Fund."

99.     The Monitor shall oversee the Restitution Obligation and shall have the discretion to determine the manner of distribution of such funds in an equitable fashion to the investors identified by the Commission or may defer distribution until such time as the Monitor deems appropriate.

100.     The Settling Defendants shall cooperate with the Monitor as appropriate to provide such information as the Monitor deems necessary and appropriate to identify the investors to whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of any Restitution Obligation payments.  The Settling Defendants shall execute any

22

documents necessary to release funds that they have in any repository, bank, investment or other financial institution, wherever located, in order to make partial or total payment toward the Restitution Obligation.

101.    The Monitor shall provide the Commission at the beginning of each calendar year with a report detailing the disbursement of funds to investors during the previous year.  The Monitor shall transmit this report under a cover letter that identifies the name and docket number of this proceeding to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581 and Manal M. Sultan, Deputy Director, 290 Broadway, 6th Floor, New York, NY 10007.

102.    The amounts payable to each investor shall not limit the ability of any investor from proving that a greater amount is owed from the Settling Defendants or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any investor that exist under state or common law.

103.    Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each investor who suffered a loss is explicitly made an intended third-party beneficiary of this Consent Order and may seek to enforce obedience of this Consent Order to obtain satisfaction of any portion of the restitution that has not been paid by the Settling Defendants, to ensure continued compliance with any provision of this Consent Order, and to hold the Settling Defendants in contempt for any violations of any provision of this Consent Order.

104.    To the extent that any funds accrue to the U.S. Treasury for satisfaction the Settling Defendants' Restitution Obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth above.

**B.**    **Provisions Related to Monetary Sanctions**

105.    Partial Satisfaction:  Acceptance by the Commission or the Monitor of any partial payment of any of the Settling Defendants' Restitution Obligation shall not be deemed a waiver of their obligation to make further payments pursuant to this Consent Order, or a waiver of the Commission's right to seek to compel payment of any remaining balance.

**C.**    **Cooperation**

106.    Baldwin shall cooperate fully and expeditiously with the Commission, including the Division of Enforcement ("Division"), in this action.  As part of such cooperation, Baldwin agrees to:

    a.    preserve and produce to the Commission in a responsive and prompt manner as requested by the Division's staff, all relevant non-privileged documents, information, and other materials wherever located, in the appropriate possession, custody, or control of Baldwin;

    b.    utilize his knowledge and skill to explain transactions and interpret information and terminology;

    c.    prepare and appear for interviews and  testimony at such times and places as requested by the Division's staff;

    d.    respond completely and truthfully to all inquiries and interviews, when requested to do so by the Division's staff;

    e.    identify and authenticate relevant documents, execute affidavits or declarations, and testify completely and truthfully at depositions, trial, and other judicial proceedings, when requested to do so by the Division's staff;

    f.    accept service by mail, electronic mail, or facsimile transmission of

notices or subpoenas for documents and/or testimony at depositions, hearings, trials, or in connection with the proceedings;

g.    appoint Baldwin's undersigned attorney as agent to receive service of such notices and subpoenas; and

h.    waive the territorial limits on service contained in Rule 45 of the Federal Rules of Civil Procedure and any applicable local rules in connection with requests or subpoenas of the Division's staff.

## VI.    MISCELLANEOUS PROVISIONS

107.    Until such time as the Settling Defendants satisfy in full their Restitution Obligation under this Consent Order, upon the commencement by or against any of the Settling Defendants of insolvency, receivership or bankruptcy proceedings or any other proceedings for the settlement of any of Settling Defendant's debts, all notices to creditors required to be furnished to the Commission under Title 11 of the United States Code or other applicable law with respect to such insolvency, receivership bankruptcy or other proceedings, shall be sent to the address below:

Secretary of the Commission
Office of the General Counsel
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street N.W.
Washington, DC 2058

108.    Notice: All notices required to be given by any provision in this Consent Order, except as set forth above, shall be sent certified mail, return receipt requested, as follows:

Notice to the Commission:

Manal M. Sultan, Deputy Director
Division of Enforcement
Commodity Futures Trading Commission

Ted Weiss Federal Building
290 Broadway, 6th Floor
New York, NY 10007

Notice to Defendant Baldwin:

Matthew P. Leto
Leto Law Firm
201 South Biscayne Blvd.
Suite 2700
Miami, Florida 33131

Notice to Defendant NCB:

Matthew P. Leto
Leto Law Firm
201 South Biscayne Blvd.
Suite 2700
Miami, Florida 33131

All such notices to the Commission shall reference the name and docket number of this action.

109.    Change of Address/Phone:  Until such time as the Settling Defendants satisfy in full their Restitution Obligation as set forth in this Consent Order, the Settling Defendants shall provide written notice to the Commission by certified mail of any change to their telephone number and mailing address within ten calendar days of the change.

110.    Entire Agreement and Amendments:  This Consent Order incorporates all of the terms and conditions of the settlement among the parties hereto to date.  Nothing shall serve to amend or modify this Consent Order in any respect whatsoever, unless: (a) reduced to writing; (b) signed by all parties hereto; and (c) approved by order of this Court.

111.    Invalidation:  If any provision of this Consent Order or if the application of any provision or circumstance is held invalid, then the remainder of this Consent Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

112.    Waiver:  The failure of any party to this Consent Order or of any investor at any time to require performance of any provision of this Consent Order shall in no manner affect the right of the party or investor at a later time to enforce the same or any other provision of this Consent Order.  No waiver in one or more instances of the breach of any provision contained in this Consent Order shall be deemed to be or construed as a further or continuing waiver of such breach or waiver of the breach of any other provision of this Consent Order.

113.    Continuing Jurisdiction of this Court:  This Court shall retain jurisdiction of this action to ensure compliance with this Consent Order and for all other purposes related to this action, including any motion by the Settling Defendants to modify or for relief from the terms of this Consent Order.

114.    Injunctive and Equitable Relief Provisions:  The injunctive and equitable relief provisions of this Consent Order shall be binding upon the following persons who receive actual notice of this Consent Order, by personal service or otherwise: (1) Settling Defendants; (2) any officer, agent, servant, employee, or attorney of the Settling Defendants; and (3) any other persons who are in active concert or participation with any persons described in subsections (1) and (2) above.

115.    Authority:  Ross Baldwin hereby warrants that he is the sole owner and officer of NCB, and that this Consent Order has been duly authorized by NCB and he has been duly empowered to sign and submit this Consent Order on behalf of NCB.

116.    Counterparts and Facsimile Execution:  This Consent Order may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered (by facsimile, e-mail, or otherwise) to the other party, it being understood that all

parties need not sign the same counterpart. Any counterpart or other signature to this Consent Order that is delivered by any means shall be deemed for all purposes as constituting good and valid execution and delivery by such party of this Consent Order.

117.    Contempt: The Settling Defendants understand that the terms of the Consent Order are enforceable through contempt proceedings, and that, in any such proceedings they may not challenge the validity of this Consent Order.

118.    Agreements and Undertakings: The Settling Defendants shall comply with all of the undertakings and agreements set forth in this Consent Order.

119.    There being no just reason for delay, the Clerk of the Court is hereby ordered to enter this *Consent Order for Permanent Injunction and Other Equitable Relief Against Defendants Ross Baldwin and National Coin Broker, Inc.* forthwith and without further notice.

IT IS SO ORDERED on this __12__ day of _____September_____, 2025.

                                        _____
                                        **UNITED STATES DISTRICT JUDGE**

CONSENTED TO AND APPROVED BY:

R. Stephen Painter, Jr.
Patrick Daly                    9/12/25
Karin Roth
Division of Enforcement
Commodity Futures Trading Commission
290 Broadway, 6th Floor
(646) 746-9700
spainter@cftc.gov
pdaly@cftc.gov
kroth@cftc.gov

Date: _____ 5-12-25

Defendant Ross Baldwin

Defendant National Coin Broker, Inc.


APPROVED AS TO FORM:

Matthew P. Leto
Leto Law Firm
201 South Biscayne Blvd.
Suite 2700
Miami, Florida 33131
Tel: (305) 341-3155
Email: MLeto@letolawfirm.com
*Counsel for Defendants Ross Baldwin and
National Coin Broker, Inc.*